BARNES, J.,
 

 for the Court.
 

 ¶ 1. This appeal involves a will contest and a contest over inter vivos gifts. Doris Frazier, the sister of the decedent Gus Caspelich, appeals the judgment of the Chancery Court of Harrison County, Second Judicial District. The chancery court ruled that the decedent’s will, which left his estate to Joyce Loew, was valid. The chancery court found that no confidential relationship existed between Gus and Joyce either at the time of the inter vivos gifts or at the time of the execution of the will. Finding no error, we affirm.
 

 STATEMENT OF FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. Gus died on February 25, 2004, at the age of eighty-seven, in Harrison County, Mississippi. His third -wife of approximately forty years, Inez, predeceased him in June 2000. Gus had two grown sons from his marriage to his second wife, but he had been estranged from them for a long time. Testimony showed Gus took Inez’s death very hard, becoming deeply depressed.
 

 ¶ 3. Directly after Inez’s death, Gus’s sister, Doris, began managing his affairs. In July 2000, Doris accompanied Gus to the bank and had him open a checking account. She placed her name jointly on this checking account, in which only Gus’s money was deposited, and made it payable to her on his death. She also had Gus change the “pay on death” beneficiary on two certificates of deposit from a friend to
 
 *1202
 
 her.
 
 [1]
 
 During this time Doris, who lived close by, went to Gus’s house three to five times a week and assisted Gus in making sure he took his medicines and writing checks for his monthly bills. Doris also wanted Gus to execute a new will, and on August 21, 2000, she drove him to an attorney whom she had selected. In this will, Gus named Doris as his sole beneficiary. Doris testified that at this time, her relationship with her brother was good.
 

 ¶ 4. In August 2000, Gus became reacquainted with a friend, Joyce Loew, with whom he and his wife, Inez, had formerly socialized. Joyce, who was twenty-five years younger than Gus, lived and worked in Pensacola, Florida, and her longtime boyfriend had recently passed away in July. Gus and Joyce continued dating, visiting one another, and talking on the phone a great deal through the fall of 2000. Gus’s mental and physical condition improved, and he spent time at both his home in Biloxi and Joyce’s home in Pensacola. Eventually, Gus no longer needed Doris’s care. Gus and Joyce’s relationship upset Doris, and the siblings began to argue.
 

 ¶ 5. In January 2001, Gus asked Joyce to quit her job as a hostess/cashier in a restaurant and come to live with him in Mississippi. In return, he would pay for all of her household bills in Florida. Joyce agreed. Also at this time, Gus also made several changes in his finances. On January 19, 2001, Gus removed Doris’s name from his joint checking account and added Joyce’s, with right of survivorship. Joyce, however, testified she initially did not approve of this change, and she agreed to the change only after Gus made the ultimatum that if she refused to put her name on the account, he would find someone else, just to make sure that Doris’s name was not on any of his assets.
 

 ¶ 6. Gus also made the following changes to his finances in early 2001, without Joyce’s knowledge while she was in Florida: on January 22, 2001, Gus withdrew approximately $15,000 from a savings account; on January 23, 2001, he changed the beneficiaries on both of his certificates of deposit from Doris to Joyce; Gus found his own attorney who was recommended by a friend, and on January 24, 2001, he executed the will now contested, which named Joyce, not Doris, as his sole beneficiary. Joyce testified that she did not ask Gus to make the change. The attorney testified that Gus told him he was mad at his sister and wanted to leave his assets to someone else. A friend accompanied Gus to the attorney’s office. Gus brought with him a doctor’s statement written on a prescription pad from Doris’s physician, Dr. Paul Pavlov, stating that Gus was “of sound mind and able to manage his own affairs.” The will was executed, and the doctor’s statement attached. Finally, on January 26, 2001, Gus paid $11,788.05 to retire the mortgage on Joyce’s home in Florida.
 

 ¶ 7. The evidence shows Doris continued to sign checks to pay for Gus’s bills out of his checking account after January 2001, even though her name was taken off the account. The evidence also shows Joyce never used the joint checking account or any of Gus’s accounts with her name on them. Doris testified that Gus lied to her about giving his assets to Joyce. In March 2001, when Doris found out Gus had changed the names on his accounts from her to Joyce, she berated him about it and “disowned” him as her brother. Gus and Doris never reconciled.
 

 
 *1203
 
 ¶ 8. During the next three years, the evidence shows Gus and Joyce were very much a couple and traveled together. Gus gave Joyce small gifts and roses on several occasions. Joyce testified that Gus bought her an engagement and a wedding ring, as they planned to be married, but they kept this fact private. In November 2001, Gus transferred title to his 1995 Lincoln to Joyce, because her vehicle was having problems. In January 2002, Gus executed a document which gave Joyce power of attorney; however, she never used it. In February 2002, Gus executed a written document at the attorney’s office where he had previously executed his will, stating that he did not want a funeral service. Instead, he wanted to be cremated and have Joyce spread his ashes in the woods. In September 2003, Gus transferred $50,000 from their joint checking account to an account in Joyce’s name. Gus had been living primarily in Florida with Joyce. In October 2003, Gus sold his home in Mississippi for $160,000 and placed $150,000 in a joint account with Joyce in Florida. In November 2003, he transferred title to a 2000 Lincoln to Joyce as well. Joyce maintained she had nothing to do with Gus’s business or financial decisions during this time.
 

 ¶ 9. A witness testified that in October 2003, Gus was not in good physical condition. It was difficult for Gus to get around, but he was not in a wheelchair. Gus passed away on February 25, 2004. Following Gus’s specific instructions, Joyce did not notify friends and family of his death.
 

 ¶ 10. Joyce filed, and the court granted, her petition to probate Gus’s will on February 27, 2004, in the Harrison County Chancery Court. In response, Doris petitioned to contest the will and the inter vivos gifts Gus had bestowed upon Joyce during their three-year relationship. Doris argued that Gus and Joyce were in a confidential relationship where Joyce dominated him. The chancery court granted Doris a temporary restraining order, freezing Gus’s accounts and assets. Also, the chancery court ordered Joyce to present an inventory of all gifts, property, and assets that Gus gave her, them value, and location. On April 1, 2004, the ehancery court granted Doris’s preliminary injunction, further enjoining Joyce from dissipating any assets she received as inter vivos from Gus.
 

 ¶ 11. A hearing on the issues was held on October 18-19, 2006, in the chancery court. All of the witnesses testified that Gus was an independent and colorful character. Gus was also generally characterized as opinionated and strong-willed. One of Gus’s friends testified that Gus was “very possessive” and “consumed” with Joyce early in their relationship. Another friend testified that Gus told him Joyce treated him “like a king.” Gus described Joyce to one of his friends as “a fine Christian woman who could be heard praying from one end of the house to the other.” Joyce testified that Doris and Gus were “enemies.” Gus’s friends claimed Gus became distant with them once he started dating Joyce, but he was obviously very fond of her.
 

 ¶ 12. Doris described her brother as a womanizer who was tight with his money and had a temper. Doris claimed she “disowned” Gus because she felt “used and abused”; she stated she had continued to take care of Gus and to pay his bills with the understanding she was sole beneficiary of his assets. She begged him not to give Joyce all of his money; instead, he lied to her about what he had done. Doris admitted, however, that Joyce never made Gus do anything he did not want to do. According to Doris, Gus’s health conditions included a pacemaker in his heart, prob
 
 *1204
 
 lems with his knee, problems with his vision, diabetes, asbestosis, and high blood pressure. Joyce testified she was aware of these health issues, but she never helped Gus with his medication because “he was a good thinker all the way until the end.” Other witnesses corroborated Gus’s mental competence.
 

 ¶ 13. After Doris put on her case-in-chief, Joyce moved for an involuntary dismissal. The chancellor took the motion under advisement.
 

 ¶ 14. On January 23, 2007, Joyce filed a motion for sanctions, seeking payment of her attorneys’ fees by Doris as damages and other relief. Joyce claimed that “because [the chancery] court found” that Doris had offered no evidence of a confidential relationship between Joyce and Gus and no evidence of undue influence, this motion for attorneys’ fees was appropriate.
 

 ¶ 15. The following day, the chancellor entered a judgment granting involuntary dismissal pursuant to Mississippi Rule of Civil Procedure 41(b). In his nine-page opinion, the chancellor found that Doris had failed to carry her burden of proving that a confidential relationship existed between Joyce and Gus when he made the inter vivos gifts to Joyce or when he executed his will making Joyce his sole beneficiary (at any point prior to January 24, 2001). The chancellor found that “[i]n all of these events, Gus acted independently without influence from Joyce and while he was not dependent on Joyce.” The chancellor did find that a confidential relationship existed when Gus, toward the very end of his life, fell gravely ill, and Joyce cared for him. However, this was long after the inter vivos gifts and execution of the will.
 
 [2]
 
 The chancellor concluded that:
 

 there is nothing in the law of this State that this Court could find which would prevent a gentleman of any age from voluntarily bestowing upon his girlfriend/fianeé gifts of money and cars or naming her as the sole beneficiary of his Will. The Court finds that this case is nothing more than the sister of the deceased being incensed that her brother found love and happiness in his waning years with what ... appears to be an honorable woman who genuinely returned the love and affection of her boyfriend/fiancé, and who chose to leave his entire estate to her, rather than to his sister.
 

 ¶ 16. In response, Doris filed a motion to alter or amend the judgment. A hearing was held on the motion, and Joyce orally renewed her motion for sanctions and attorneys’ fees. The chancellor held the motion for sanctions in abeyance and never ruled on it. Doris’s motion to alter or amend the judgment was denied. Doris timely appealed, raising the following issues: (1) whether a confidential relationship existed between Joyce and Gus, (2) whether Joyce abused this confidential relationship, (3) whether the existence of a confidential relationship between Gus and Doris is relevant, and (4) whether disclosure of Joyce’s sister’s proffered testimony should be accepted by the court. Additionally, Joyce claims a “counter-appeal” on the issue of attorneys’ fees.
 

 
 *1205
 
 STANDARD OF REVIEW
 

 ¶ 17. In a will contest, the chancellor’s findings of fact will not be disturbed by this Court “unless they are manifestly wrong, or clearly erroneous, or unless the chancellor applied an erroneous legal standard.”
 
 Estate of Grantham v. Roberts,
 
 609 So.2d 1220, 1223 (Miss.1992). This Court will consider the entire record before us and accept those facts and reasonable inferences which support the chancellor’s findings.
 
 Madden v. Rhodes,
 
 626 So.2d 608, 616 (Miss.1993). “[T]he chancellor, being the only one to hear the testimony of witnesses and observe their demeanor, is to judge their credibility. He is best able to determine the veracity of their testimony, and this Court will not undermine the chancellor’s authority by replacing his judgment with its own.”
 
 Id.
 
 If the chancellor’s findings are supported by substantial, credible evidence, reversal is not warranted.
 
 Estate of Grubbs; Jacks v. Woods,
 
 753 So.2d 1043, 1046(¶ 7) (Miss.2000).
 

 DISCUSSION
 

 I. Whether the chancellor erred in finding no confidential relationship existed between Joyce and Gus.
 

 ¶ 18. Doris argues on appeal that a confidential relationship existed between Joyce and Gus; therefore, a presumption of undue influence arises as to Gus’s inter vivos gifts to Joyce and, combined with Joyce’s abuse of the relationship, a presumption of undue influence arises as to Gus’s last will and testament.
 

 ¶ 19. The chancellor appropriately noted in his opinion that there are two issues in this matter: (1) the validity of Gus’s will leaving his entire estate to Joyce, and (2) the validity of the inter vivos gifts given by Gus to Joyce. In analyzing these issues, we must first determine if and when a confidential relationship arose, because the rules of law are different regarding gifts bequeathed by will and inter vivos gifts when a confidential relationship exists between the parties.
 
 Madden,
 
 626 So.2d at 618. When the evidence shows a confidential relationship existed during the making of the will, a presumption of undue influence arises only when there has been some abuse of the confidential relationship, such as some involvement in the preparation or execution of the will.
 
 Id.
 
 Alternatively, when the evidence shows there is a confidential relationship at the time inter vivos gifts are made, “there is an automatic presumption of undue influence even without abuse of the confidential relationship. Such gifts are presumptively invalid.”
 
 Id.
 
 The burden shifts then to the one who wishes to uphold the gift to rebut the presumption by clear and convincing evidence.
 
 Id.
 
 at 619.
 

 ¶ 20. The Mississippi Supreme Court has described a confidential relationship as follows:
 

 Whenever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the other because of the latter’s dependency upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such relationship as fiduciary in character. The dependency factor was emphasized again when we stated, “In determining whether or not a fiduciary or confidential relationship existed between two persons, we have looked to see if one person depends upon another.”
 

 Id.
 
 at 617 (internal citations omitted). The party seeking to establish a confidential relationship has the burden of proving such a relationship by clear and convincing
 
 *1206
 
 evidence.
 
 Foster v. Ross,
 
 804 So.2d 1018, 1023(¶ 15) (Miss.2002) (citing
 
 Whitworth v. Kines,
 
 604 So.2d 225, 230 (Miss.1992)). The factors courts use to determine whether a confidential relationship exists are as follows:
 

 (1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has their medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and another.
 

 In re Estate of Dabney v. Hataway,
 
 740 So.2d 915, 919(¶ 12) (Miss.1999).
 

 ¶ 21. In the chancellor’s August 21, 2007, order denying Doris’s motion to alter or amend the judgment, he went through the confidential relationship factors in detail, finding no confidential relationship existed between Gus and Joyce until near the end of Gus’s life. We find no error with his findings.
 

 ¶ 22. Pursuant to the
 
 Dabney
 
 factors, there was no evidence that Gus was physically incapacitated during the relevant time and had to be taken care of by others. While testimony showed Gus was depressed following the death of his wife in June 2000 and Doris cared for him around this time, there is no proof Gus could not take care of himself, and there is no proof Joyce took care of Gus. In fact, during the inception of their relationship, Gus and Joyce lived in different states.
 

 ¶ 23. Gus and Joyce maintained a close and loving relationship and later apparently had plans to marry. There is no evidence Gus was dependent on Joyce for transportation at this time. Joyce provided no medical care for Gus until the end of his life. Gus did maintain joint accounts with Joyce, but the circumstances indicate this was an independent act by Gus for the primary purpose of removing Doris from all of his assets after their falling-out, and leaving them to Joyce, whom he loved. Furthermore, Joyce objected to Gus’s financial actions that were to her benefit, and there was no evidence Joyce used these joint accounts to dominate Gus. In fact, there is no evidence Joyce ever used these accounts she shared with Gus. Finally, Gus made Joyce the beneficiary of his certificates of deposit, as well as the beneficiary of his estate, without her knowledge and while she was out of state.
 
 [3]
 

 ¶ 24. As far as any mental and physical weakness, testimony shows Gus’s depression and health improved once he started seeing Joyce. Gus was portrayed by friends, and even his sister, as a willful, independent man who acted on his own. He was systematic and intentional in the removal of Doris from his business and financial affairs. There can be no doubt that Gus was of advanced years, being eighty-four years old, but his health was not particularly poor during the relevant time. Gus appeared to suffer only the common physical ailments of a person his age. A power of attorney did exist between Joyce and Gus, but it was executed in early 2002, and Joyce never utilized it.
 

 ¶ 25. Doris argues that the only testimony that determined Gus was not in a confidential relationship with Joyce was Joyce’s testimony, and unless corroborated, her testimony is of no consequence. She cites
 
 Madden
 
 in support, which states
 
 *1207
 
 “when a court of equity is faced with a large gift to a dominant party by the weaker in a confidential relation, it must hear from someone besides the beneficiary, or receive clear and convincing evidence beyond that from the lips of the beneficiary, this is, in truth and in fact, what the donor wished to do on his own.”
 
 Madden,
 
 626 So.2d at 625. However, Doris misapprehends this statement of law. It is referring to evidence presented by the beneficiary in order to rebut the presumption of undue influence once a confidential relationship has already been established. At any rate, we find, as the chancellor did, that Joyce’s testimony was consistent with the testimony of the other witnesses regarding Gus and Joyce’s relationship and the facts surrounding the execution of the will and the giving of the inter vivos gifts.
 

 ¶ 26. The chancellor concluded that Doris failed to meet her burden of proving by clear and convincing evidence that there was a confidential relationship between Gus and Joyce during the pertinent time frame. Having reviewed the record in detail, we cannot find the chancellor’s findings of fact are manifestly wrong or clearly erroneous. The couple was not dependent upon one another, and in all likelihood, Gus was the dominant member of the relationship, making his own decisions about his finances with a steadfast intent. There is no proof of a dominating influence by Joyce.
 

 ¶ 27. Since we find the chancellor correct in finding no confidential relationship existed at the relevant time, analysis of undue influence is unnecessary for both the execution of the will and the giving of the inter vivos gifts. We note the chancellor stated that even if there was a confidential relationship, there is no evidence indicating an abuse of that relationship, and we agree.
 

 II. Whether the issue of a confidential relationship between Doris and Gus is material.
 

 ¶ 28. Doris complains that the chancellor based “much of his ruling” on findings of fact regarding the relationship between Gus and Doris; however, she states this is irrelevant to the contest of Gus’s will naming Joyce as his beneficiary, and this Court should not consider these findings. We agree with Doris that the issue is not whether there is a confidential relationship between Gus and Doris, but between Gus and Joyce. However, neither of the chancellor’s orders stated explicitly that there was a confidential relationship between Gus and Doris. Furthermore, at the hearing on the motion to reconsider, the chancellor even admitted that “I don’t think that Doris Frazier’s case was properly before the Court.” We note, however, that the testimony about the siblings’ relationship provides insight into the relationship between Gus and Joyce, and it tends to show that Gus was independent and could not be dominated by someone else.
 

 III. Whether the proffered testimony of Geneva Gross at the chancery court hearing should be accepted as testimony.
 

 ¶29. Geneva Gross is Joyce’s sister. At the hearing before the chancellor on October 19, 2006, after Doris presented her case-in-chief and rested, Joyce moved for an involuntary dismissal. The chancellor took the motion under advisement instead of ruling on it from the bench and let Joyce present her witnesses who were already present in the courtroom. When Joyce’s counsel called her first witness to the stand-Gross-counsel for Doris objected because Joyce did not disclose Gross as a witness in discovery. The chancellor accepted Gross’s testimony in the form of a proffer only, stating he would decide whether it would be accepted as testimony
 
 *1208
 
 later. Doris now requests this Court to decide if acceptance of this testimony may be sought by Joyce, if the case is remanded. As we are affirming the judgment in favor of Joyce, and this case will not be remanded, we find this issue is moot.
 

 IV. Whether the chancellor erred in failing to award attorneys’ fees to Joyce.
 

 ¶ 30. Joyce raises what she calls a “counter-appeal” on the issue of her attorneys’ fees. On January 23, 2007, in the chancery court, Joyce filed a “Motion for Sanctions,” seeking damages against Doris and her attorney, one day before the chancellor entered his judgment. In her motion, Joyce stated that “[tjhis Court has found that Plaintiff offered no evidence of a confidential relationship” between Joyce and Gus at the relevant time, as well as no evidence of any undue influence. Joyce also argued that Mississippi Code Annotated section 11-55-5(1) (Rev.2002), Mississippi Rule of Civil Procedure 11(b), and case law, provide that attorneys’ fees may be awarded where a party’s conduct would justify an award of punitive damages, even if such damages were not actually awarded. Section 11-55-5(1) provides in part that:
 

 Except as otherwise provided in this chapter, in any civil action commenced or appealed in any court of record in this state, the court shall award, as part of its judgment and in addition to any other costs otherwise assessed, reasonable attorney’s fees and costs against any party or attorney if the court, upon the motion of any party or on its own motion, finds that an attorney or party brought an action, or asserted any claim or defense, that is without substantial justification....
 

 Mississippi Rule of Civil Procedure 11(b) provides for sanctions for the filing of frivolous pleadings or motions, and the court may order the opposing party to pay “reasonable attorneys’ fees.”
 

 ¶ 31. Joyce argues that since the chancery court found that Doris offered no evidence of a confidential relationship between Joyce and Gus, and there was no evidence of undue influence, Doris should pay the $15,000 in attorneys’ fees she had incurred to defend herself. Oddly, this statement was not accurate at the time Joyce filed her motion because the finding of no confidential relationship was not made until the chancellor’s order of January 24, the day after Joyce filed her motion for sanctions.
 

 ¶ 32. Joyce argues on appeal that the chancellor “has consistently refused to rule” on this motion, and she now requests this Court to award her attorneys’ fees. We note that the matter was brought to the court’s attention at the June 18, 2007, hearing on Doris’s motion to amend or alter the judgment. Counsel for both sides presented brief arguments on the issue. In response to the motion for sanctions, counsel for Doris contended that the motion was not proper at that time as the motion for reconsideration of the merits was still pending.
 
 [4]
 
 The chancellor then responded that he would hold the matter in abeyance. We find no evidence, however, that the chancellor refused to rule on the motion.
 

 ¶ 33. For cross-appeals, Mississippi Rule of Appellate Procedure 4(a) requires that a notice of appeal be filed with the clerk of the trial court. The
 
 *1209
 
 comment to Rule 4(c) explains a notice of appeal is required for cross-appeals and should be filed within fourteen days after the date of the first notice of appeal, unless a longer period is allowed by another provision of Rule 4. We find no notice of appeal filed by Joyce in the record for her “counter-appeal”; therefore, this issue is not properly before this Court. Moreover, once the chancellor held the matter in abeyance, the record does not reflect that Joyce raised the motion for sanctions again until her appellate brief. Doris did not file her notice of appeal until twenty-eight days after entry of the final judgment. At any time in the interim, Joyce could have requested a ruling on her motion for sanctions, but she failed to do so. It is the movant’s duty “to pursue the motion to hearing and decision by the court.”
 
 Carrow v. Carrow,
 
 741 So.2d 200, 204(¶ 27) (Miss.1999). Accordingly, we find that, even if the matter were properly before us, Joyce’s motion for sanctions and attorneys’ fees was waived.
 

 CONCLUSION
 

 ¶ 34. The chancellor did not err in finding no confidential relationship existed between Gus and Joyce during the time of the execution of his will or when he gave Joyce inter vivos gifts. Therefore, we affirm the chancellor’s judgment.
 

 ¶ 35. THE JUDGMENT OF THE CHANCERY COURT OF HARRISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ„ CONCUR. IRVING, J., CONCURS IN PART AND IN THE RESULT.
 

 [1]
 

 . Before his wife's death, in February 2000, Gus placed $125,000 in a certificate of deposit payable on death to his longtime friend, Wayne Moore. In March 2000, Gus placed $25,000 in a certificate of deposit payable to Moore as well.
 

 [2]
 

 . To the extent there is a gap in the time frame in the chancellor's ruling regarding a confidential relationship between the execution of the will in January 2001, when there was no confidential relationship, and the time around Gus’s death in 2004, when there was a confidential relationship, we find it makes no difference to the outcome of this litigation. Since the chancellor found the will valid, the inter vivos gifts made to Joyce in 2003, even if found invalid due to a confidential relationship, would merely return to Gus’s estate and be inherited by Joyce as testamentary gifts.
 

 [3]
 

 . However, testimony shows Joyce was in slate when her name was added to the joint checking account.
 

 [4]
 

 . Counsel for Doris responded, “This is way premature. I’m here asking you to change your Judgment based upon six of seven factors saying that there is a confidential relationship in the face of your ruling that said there wasn’t one.... When that's done, and you still don't agree with me, then maybe this motion is in proper order. But it’s not in proper order now.”