# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01412-COA

| | |
|---|---|
| **MAGEE COMMUNITY CARE CENTER, LLC D/B/A HILLCREST NURSING CENTER, LLC AND REGIONAL CARE, LLC** | **APPELLANTS** |
| **v.** | |
| **TREKEELA PERKINS, INDIVIDUALLY AND ON BEHALF OF AND FOR THE USE AND BENEFIT OF THE WRONGFUL DEATH BENEFICIARIES OF LAWRENCE WILLIAMS** | **APPELLEE** |

| | |
|---|---|
| DATE OF JUDGMENT: | 08/14/2019 |
| TRIAL JUDGE: | HON. EDDIE H. BOWEN |
| COURT FROM WHICH APPEALED: | SIMPSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | JOSEPH SPENCER YOUNG JR. |
| ATTORNEYS FOR APPELLEE: | RICHARD PAUL WILLIAMS III |
| | DARYL MATTHEW NEWMAN |
| | COURTNEY McREYNOLDS WILLIAMS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 04/13/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WILSON, P.J., LAWRENCE AND McCARTY, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1. Lawrence Williams died while in the care of Hillcrest Nursing Center ("Hillcrest").

Trekeela Perkins, as the mother of Williams's surviving minor son, subsequently brought a

wrongful death action against Hillcrest. Hillcrest filed a motion to compel arbitration based

on the arbitration provision in the admission agreement between Hillcrest and Williams. The

trial court ultimately denied Hillcrest's motion, finding that Williams lacked the requisite

mental capacity to enter into the agreement. Hillcrest now appeals and raises eight issues.[1]

For efficiency and clarity, we consolidate these claims into two issues: (1) whether the trial

court should have granted Hillcrest's request for limited discovery; and (2) whether the

arbitration provision is valid and enforceable. Finding no error, we affirm the trial court's

denial of Hillcrest's motion to compel arbitration.

## FACTS

¶2.     Williams was fifty-five years old when he was admitted to Hillcrest on October 25,

2016. He had an extensive documented history of behavioral disturbances and mental-health

issues, including psychosis, severe cognitive impairment, dementia, and severe mental

illness. He also suffered from alcoholism, diabetes, hypertension, and hyperlipidemia.[2]

¶3.     Upon entering Hillcrest, Williams was required to sign an admission agreement,

which included an arbitration provision. In relevant part the provision stated:

> This agreement to arbitrate includes, but is not limited to, any claim for
> payment, nonpayment or refund for services rendered to the Resident or

---

[1] Hillcrest argues for the first time on appeal that Perkins is equitably estopped from denying the terms of the arbitration provision because she directly benefitted from the agreement. *See Scruggs v. Wyatt*, 60 So. 3d 758, 767-68 (¶21) (Miss. 2011). Hillcrest also maintains that the agreement is procedurally and substantively conscionable. In response, Perkins argues for the first time on appeal that the arbitration provision is unconscionable because it was contained within Hillcrest's admission documents and was presented on a "take it or leave it" basis. Because neither of these defenses were raised in the trial court, they are waived on appeal. *See Kuiper v. Tarnabine*, 20 So. 3d 658, 661 (¶11) (Miss. 2009) (finding that appellants were procedurally barred from raising an issue that they failed to raise in the trial court).

[2] Hyperlipidemia is a condition in which there are high levels of fat particles (lipids) in the blood.

2

Facility . . . or misrepresentation, negligence gross negligence, malpractice, or any other claim based on any departure from accepted standards of medical health care or safety whether sounding in tort or in contract.

Williams signed the agreement "Hawrence Williams." The agreement also contained a miscellaneous provision stating that "any responsible party or parties executing this agreement represent and warrant that they have the authority, either express, implied, or apparent, to act as agent or the resident." Williams's brother signed the agreement as a responsible party. Williams's brother also signed a witness acknowledgment of competency stating that he believed his brother was mentally competent.

¶4.     Prior to being admitted to Hillcrest, Williams was a resident at two other nursing homes. First, he was a resident at Pleasant Hills Community Living Center ("Pleasant Hills") from September 11, 2015, to September 26, 2016. At Pleasant Hills, the admission notes stated that Williams could not state the time, place, or date. Further, records from Pleasant Hills indicated that Williams was incontinent, played with and threw his own excrement, refused treatment, and threatened and attacked the staff. A psychiatric evaluation conducted on July 20, 2016, noted that Williams had a poor memory, impaired judgment, bipolar disorder, neurocognitive disorder, and probable Alzheimer's disease.

¶5.     On September 27, 2016, Williams was admitted to his second nursing home, West Point Living Center ("West Point"). The records from West Point noted that Williams was diagnosed as having a psychotic disorder with delusions, dementia, and anxiety. Additionally, Williams exhibited the same behavior as he did at Pleasant Hills, such as being

3

combative with nurses, being incontinent, and refusing medication. On September 30, 2016, Williams scored a five out of fifteen on a "Brief Interview for Mental Status" and was diagnosed with severe cognitive impairment.

¶6.     Williams remained at West Point until he transferred to Hillcrest on October 25, 2016, to be closer to his family. Williams signed his pre-admission screening application "Lawrence Hawrence," and he signed another acknowledgment form "Lawrencm." In Hillcrest's "Transfer Summary and Nurse Screening," it is noted that Williams had a psychotic disorder with delusions and dementia. According to Hillcrest's "Departmental Notes," Williams was "very talkative," "excited," and "alert" during his first few days at Hillcrest. However, between October 28, 2016, and October 31, 2016, there were multiple instances in which Williams was combative with staff members and other residents. On October 28, 2016, Williams refused incontinence care and insulin administration. On October 29, 2016, Williams yelled at another resident and hit and cursed a nurse. That evening, he ate shaving cream and put shaving cream in his coffee. On October 29, 2016, Williams cursed at nurses and refused care and was found with razors and a butter knife in his pocket. On October 30, 2016, he continued to curse at staff members and used his hands to smear his stool on his bed rails and sheets.

¶7.     On October 31, 2016, Hillcrest indicated that Williams had memory problems and stated he had a severely impaired cognitive status for making decisions regarding tasks of daily life. That same day, Williams was admitted to St. Dominic's Hospital in Jackson,

Mississippi, for a psychiatric evaluation.

¶8.     During the psychiatric evaluation, the St. Dominic's physician noted that Williams had mood and behavioral disturbances secondary to dementia and psychomotor retardation. A few weeks later, Williams went back to St. Dominic's for another evaluation. Following that evaluation, the St. Dominic's physician noted that Williams had progressing dementia and was unlikely to be able to function safely outside of a nursing facility and was unable to manage his routine affairs, including medical and financial decisions.

¶9.     During Williams's social assessment taken on November 21, 2016, Hillcrest conducted a Brief Interview for Mental Status. Hillcrest's notes stated that Williams "was unable to recall correct year, month and day of week." That same day, Hillcrest noted that Williams had "altered thought process [related to] severely impaired cognition."

¶10.    On June 6, 2017, Williams died at Hillcrest. On February 8, 2019, Perkins filed a complaint on behalf of and for the use and benefit of the wrongful death beneficiaries of Williams. Perkins claimed that "Williams suffered from medical conditions, skin conditions, sepsis, pneumonia, injuries, neglect, unexplained injuries, dehydration, poor hygiene, mental decline, and . . . other injuries, as a result of the improper care and treatment provided to him by the Facility and/or its staff or other personnel throughout his residency with the Facility." She further claimed that Hillcrest's negligence in its treatment and care of Williams caused his death.

¶11.    On March 8, 2019, Hillcrest filed its motion to compel arbitration and to dismiss or,

in the alternative, to stay all proceedings and the entry of a protective order. Perkins filed her "Response to Defendant's Motion to Compel Arbitration" on June 7, 2019, denying that she was bound to arbitrate because Williams lacked mental capacity to enter into the admission agreement and agree to arbitration. Perkins attached various health documents to her motion showing Williams's history of mental health issues. On June 26, 2019, Hillcrest filed its "Reply in Further Support of Motion to Compel Arbitration" and maintained that Williams was mentally competent. Hillcrest alternatively requested that the trial court allow limited discovery on the issues of Williams' mental competency and his brother's agency authority.[3]

¶12. On August 5, 2019, the court reviewed the documentary evidence and heard arguments from counsel.[4] On August 14, 2019, the trial court entered an order denying Hillcrest's motion to compel arbitration, finding that Williams lacked the requisite mental capacity to enter the agreement. The court further found that Williams's brother had no agency authority to enter into the contract on Williams's behalf. Hillcrest appealed.

**STANDARD OF REVIEW**

¶13. In reviewing a trial court's grant or denial of a motion to compel arbitration, "we review the trial judge's factual findings under an abuse-of-discretion standard, and we conduct a de novo review of all legal conclusions." *Virgil v. Sw. Miss. Elec. Power Ass'n*,

---

[3] In the original motion to compel arbitration, Hillcrest mentioned discovery in a footnote but did not request discovery as a form of relief from the court. That first appeared in Hillcrest's reply to Perkins' response.

[4] No witnesses were subpoenaed or called to testify at the hearing.

6

296 So. 3d 53, 59 (¶11) (Miss. 2020) (quoting *Smith v. Express Check Advance of Miss. LLC*, 153 So. 3d 601, 605-06 (¶8) (Miss. 2014) (footnotes omitted) (other citations omitted).

## ANALYSIS

### 1.    Did Hillcrest waive its request for limited discovery?

¶14.    Hillcrest argues that the trial court should have granted its alternative request for limited discovery.  Hillcrest sought limited discovery for two reasons: (1) to determine Williams's mental capacity at the time he entered Hillcrest; and (2) to further investigate the circumstances surrounding Williams's brother acting as his agent and responsible party during the execution of the admission agreement.

¶15.    First and foremost, Hillcrest did not raise this issue in its motion to compel arbitration; rather, it waited until its reply to make this request.  More importantly, however, Hillcrest never argued this issue at the hearing before the trial court.  In fact, there was no discussion of limited discovery during the hearing at all.  As a result, the trial court did not rule on this issue.  We cannot find the trial court in error on an issue that it neither granted nor denied. While it is clear Hillcrest did file a written request for limited discovery in its reply to Perkins's response to the original motion to compel arbitration, that request was never argued to the trial court.  The trial court never ruled one way or the other on that request.

¶16.    It is well-settled that this Court will not hold a trial court in error for an issue not presented to it for consideration.  *Bay Point Properties Inc. v. Miss. Transp. Comm'n*, 201 So. 3d 1046, 1055 (¶18) (Miss. 2016).  Further, Mississippi Rule of Civil Procedure 7(b)(1)

7

states that "[a]n application to the court for an order shall be by **motion** which, unless made during a hearing or trial, shall be made in writing, shall state with particularity the grounds therefor, and shall set forth the relief or order sought . . . ." (Emphasis added). In addition to the Rule, this Court has held that "[i]t is the movant's duty "to pursue the motion to hearing and decision by the court." *In re Caspelich*, 22 So. 3d 1199, 1209 (¶33) (Miss. Ct. App. 2009) (quoting *Carrow v. Carrow*, 741 So. 2d 200, 204 (¶27) (Miss. 1999)). As stated above, Hillcrest did not file a request for limited discovery until it was referenced in a reply to Perkins's response. Further, Hillcrest never brought the matter to the court's attention or requested a ruling on limited discovery. If Hillcrest wanted the court to rule on that request, the request should have been stated clearly in a motion or on the record at the hearing.

¶17. A trial court cannot manage a party's litigation strategy. To hold a court in error for not ruling on a request not properly presented in a motion or never brought up at a hearing when the issues are being argued before the court would undermine the laborious work of trial courts. Further, in this case, and more persuasive, to reverse this case and hold Hillcrest was entitled to limited discovery would place the trial court in error when the trial court never expressly denied that request. This Court would have to presume the trial court denied Hillcrest's request when the record simply does not support such a presumption. The court denied Hillcrest's motion to compel arbitration, and that may allow construction that the court intended to deny Hillcrest's alternative request for limited discovery, but the court never issued an order to that effect. Further, Hillcrest never filed a motion to reconsider

8

asking the court to clarify its ruling on that issue or ask for an explanation as to why it did not rule on that issue. Rather, this Court holds and reaffirms long-standing legal precedent that it is the party's responsibility to file a motion when it seeks relief from a court and to obtain a ruling on that motion. *See Billiot v. State*, 454 So. 2d 445, 456 (Miss. 1984). If the party is not satisfied with the trial court's ruling, then the party can appeal.

¶18.  The Mississippi Supreme Court "has held that unless substantial rights are affected, issues not presented to the trial judge are procedurally barred from being raised for the first time on appeal." *Ill. Cent. R.R. Co. v. Byrd*, 44 So. 3d 943, 948 (¶25) (Miss. 2010) (citing *Dora v. State*, 986 So. 2d 917, 925 (¶18) (Miss. 2008)). As discussed above, Hillcrest's request for limited discovery was not presented to the trial judge because it was stated in a reply brief as opposed to being stated in a motion. This Court does not consider issues raised for the first time in an appellant's reply brief. *See Sanders v. State*, 678 So. 2d 663, 669-70 (Miss. 1996). That same rule is applicable in the trial court. Accordingly, we find Hillcrest has not properly preserved this issue in this Court because it did legally preserve it in the trial court.

### 2. Was the Arbitration Agreement valid and enforceable?

¶19.  Notwithstanding its request for limited discovery, Hillcrest maintains that the arbitration agreement is valid and enforceable because Williams had the requisite mental capacity to enter the agreement. The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, applies to cases of nursing home admission agreements that contain arbitration clauses.

9

*Tarvin v. CLC of Jackson LLC*, 193 So. 3d 633, 636 (¶11) (Miss. 2016) (citing *Adams Cmty. Care Ctr. LLC v. Reed*, 37 So. 3d 1155, 1158 (¶7) (Miss. 2010)). This Court's analysis under the FAA has two considerations: (1) whether a valid written agreement to arbitrate exists, and (2) whether the "dispute is within the scope of the arbitration agreement." *Id*. at (¶11). "This Court applies the law of contracts to determine if a valid arbitration agreement exists." *Id*. *Tarvin* sets forth six elements for a valid contract: (1) two or more parties, "(2) consideration, (3) an agreement that is sufficiently definite, (4) *parties with legal capacity to make a contract*, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *Id*. The relevant question is twofold: whether Williams had the mental and legal capacity to enter the contract himself and/or whether his brother, who accompanied him to the Hillcrest admission and signed admission documents, had the legal capacity to enter into the contract on his behalf.

### A. Did Williams lack the requisite mental capacity to enter into the agreement with Hillcrest?

¶20. Hillcrest claims that the trial court incorrectly found that Williams lacked the requisite mental capacity to enter into the admission agreement. "The law presumes a person sane and mentally capable to enter into a contract . . . . The burden is upon the party seeking to avoid an instrument on the ground of insanity or mental incapacity to establish it by a preponderance of proof." *Frierson v. Delta Outdoor*, 794 So. 2d 220, 224 (¶8) (Miss. 2001) (citing *Foster v. Wright*, 240 Miss. 566, 572, 127 So. 2d 873, 876 (1961)); *see also Liberty Health & Rehab. of Indianola LLC. v. Howarth*, 11 F. Supp. 3d 684 (N.D. Miss. 2014).

10

Thus, Perkins was required to rebut the presumption of requisite mental capacity and show by a preponderance of the evidence that Williams was mentally incapable of entering into admission agreement.

¶21. The Mississippi Supreme Court has defined the test for capacity to contract as "whether a person could know or understand his legal rights sufficiently well to manage his personal affairs." *St. Martin v. Hixson*, 145 So. 3d 1124, 1131 (¶16) (Miss. 2014) (citing *Rockwell v. Preferred Risk Mut. Ins. Co.*, 710 So. 2d 388, 391 (¶9) (Miss. 1998)). It should be noted that on the day of admission, Williams's brother signed a certificate of competency which read as follows:

> [I] hereby attest and represent that, to the best of my personal knowledge, said resident(s) is mentally competent, is of sound and disposing mind and is able to execute this Admission Agreement and to understand the consequences of the execution of said agreement and the terms thereof.

However, in its order denying Hillcrest's motion to compel arbitration, the trial court stated that "the application and certificate of competency, signed by [Williams's] brother, are greatly outweighed by the clear documentary evidence that Williams was suffering from several cognitive and mental conditions, which would affect his ability to make his own medical and financial decisions." We agree.

¶22. As recognized by the trial court, there is a wealth of documentary evidence showing that Williams was mentally incompetent. The year leading up to his residency at Hillcrest, Williams resided at two nursing homes. Both of those nursing homes documented Williams's impaired mental status. Williams's first nursing home, Pleasant Hills, noted that

11

he could not state the time, place, or date and that he had impaired judgment. Williams was later diagnosed with a neurocognitive disorder and probable Alzheimer's disease. At West Point, Williams had a diagnosed psychotic disorder with delusions and dementia. Less than one month before transferring to Hillcrest, he was diagnosed with severe cognitive impairment.

¶23. Williams's mental issues persisted while at Hillcrest, as evidenced by Hillcrest's departmental notes and St. Dominic's psychiatric evaluations. Within days of entering Hillcrest, Williams was eating shaving cream and playing with his own stool. Just one week after William entered Hillcrest, Hillcrest stated that Williams had a severely impaired cognitive status for making decisions regarding tasks of daily life. A St. Dominic's physician stated similarly a few weeks later, noting that Williams had progressing dementia and was unlikely to be able to function safely outside of a nursing facility. Further, the physician stated that Williams was unlikely able to manage his routine affairs, including medical and financial decisions.

¶24. The evidence both before and after the date of admission, October 25, 2016, may certainly give us circumstantial guidance. But the more important question is what proof was present as to Williams's mental capacity on the date the contract was entered. After all, it may be entirely possible for dementia to progress more so one day to prevent the requisite mental capacity, and yet, the next day wane in that he may legally be able to enter into a contract. At oral argument, Williams's attorney was asked what proof of lack of mental

12

capacity was evident on the legally important date. He offered the following: Williams was diagnosed with dementia and psychotic disorder with delusions, suffered from short-term memory loss, was confused as to time, and signed the agreement "Hawrence Williams" instead of "Lawrence Williams." For the aforementioned reasons, we find the trial court did not abuse its discretion in determining that Williams lacked the mental and legal capacity to enter into the agreement.

### B. Did Williams's brother have the legal capacity to enter into the agreement on Williams's behalf?

¶25. Because the trial court found Williams was mentally incompetent, the only way the arbitration provision could be valid and enforceable is if his brother was his agent and therefore, had the legal capacity to enter the agreement on his behalf. "An agency relationship can be established through either actual or apparent authority." *Barnes, Broom, Dallas & McLeod PLLC v. Estate of Cappaert*, 991 So. 2d 1209, 1211 (¶9) (Miss. 2008). After review, we find that Williams's brother did not have the legal capacity to enter the agreement on Williams's behalf because he did not have actual or apparent authority to do so.

### i. Williams' brother did not have actual authority.

¶26. As previously stated, Williams's brother signed the admission agreement as a responsible party and also signed a document attesting to Williams's mental competency. However, the record is devoid of any proof that Williams's brother had actual authority to act as his agent, either express or implied. In its order denying Hillcrest's motion to compel

13

arbitration, the trial court briefly touched on this issue, stating that "Williams' brother did not hold a power of attorney or conservatorship to bind [] Williams or his estate to the arbitration clause." Nor was Williams's brother his health-care surrogate, which would have allowed him to make health-care decisions on behalf of Williams.[5] Accordingly, we affirm the trial court's finding on this issue.

### ii. Williams's brother did not have apparent authority.

¶27. "Apparent authority exists when a reasonably prudent person, having knowledge of the nature and the usages of the business involved, would be justified in supposing, based on the character of the duties entrusted to the agent, that the agent has the power he is assumed to have." *Eaton v. Porter*, 645 So. 2d 1323, 1325 (Miss. 1994) (quoting *Ford v. Lamar Life Ins. Co.*, 513 So. 2d 880, 888 (Miss. 1987)). In order to prevail under a theory of apparent authority or informal agency, the claimant must put forth sufficient evidence of (1) *acts or conduct of the principal indicating the agent's authority*, (2) reasonable reliance upon those acts by a third person, and (3) a detrimental change in position by the third person as a result of that reliance. *Adams Cmty. Care Ctr. LLC*, 37 So. 3d at 1160 (¶14) (emphasis added).

---

[5] Under the health-care surrogate statutes, a third party may make healthcare decisions for another individual if certain prerequisites are met:

> A surrogate may make a health-care decision for a patient who is an adult or emancipated minor if the patient has been determined by the primary physician to lack capacity and no agent or guardian has been appointed or the agent or guardian is not reasonably available.

Miss. Code Ann. § 41-41-211(1) (Rev. 2018).

14

¶28.    In *Adams Community Care Center*, the daughter of a nursing home resident brought an action alleging nursing-home negligence. *Id*. The resident was admitted to the nursing home by her two sons who signed the admission agreement, which included an arbitration provision, as the responsible party. *Id*. at 1156. The nursing home filed a motion to compel arbitration, which the daughter opposed arguing that the sons did not have apparent authority to bind their mother to the agreement. *Id*. at 1157. The court found that there was no evidence put forth by the nursing home to indicate that the resident, as the principal, indicated that her sons were her agents and had authority as such. *Id*. at 1160. In particular, the court found that there was no "acts or conduct by the principal indicating the agent's authority. *Id.*

¶29.    Similar to *Adams Community Care Center*, Hillcrest presented no evidence that Williams, through his acts or conduct, indicated that his brother was his agent. When asked at oral argument as to any proof Hillcrest may have as to the first prong of the apparent agency test, Hillcrest's attorney responded nothing "other than the mental competency of Lawrence Williams." Because Hillcrest failed to meet the first prong of the test for apparent authority, we need not address the second and third prong. Accordingly, we find that Williams's brother had no apparent authority to enter into the contract on his behalf.

## CONCLUSION

¶30.    Hillcrest's argument regarding limited discovery is waived. Further, we find that the

15

arbitration provision is invalid and unenforceable because neither Williams nor his brother had the legal capacity to enter into agreement. Accordingly, we affirm the trial court's denial of Hillcrest's motion to compel arbitration.

¶31.   **AFFIRMED.**

**WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.  BARNES, C.J., AND CARLTON, P.J., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**

16