# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00438-COA

| | |
|---|---|
| IN RE THE ESTATE OF NEWELL GENE WARREN, DECEASED: GLADYS P. WARREN AND TERRY WARREN | APPELLANTS |

v.

| | |
|---|---|
| SHERRY MAHARREY | APPELLEE |

| | |
|---|---|
| DATE OF JUDGMENT: | 03/27/2023 |
| TRIAL JUDGE: | HON. VICKI B. DANIELS |
| COURT FROM WHICH APPEALED: | YALOBUSHA COUNTY CHANCERY COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANTS: | CHARLES M. MERKEL JR. ROBERT ALEXANDER CARSON III |
| ATTORNEY FOR APPELLEE: | J. HALE FREELAND |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 07/23/2024 |
| MOTION FOR REHEARING FILED: | |

### BEFORE CARLTON, P.J., McDONALD AND McCARTY, JJ.

### CARLTON, P.J., FOR THE COURT:

¶1. This appeal involves a will contest and a contest over inter vivos transfers. Newell Gene Warren died on December 30, 2018. Mr. Warren's daughter, Sherry Maharrey, offered his Last Will and Testament for probate. The decedent's son and Sherry's brother, Terry Warren, and the decedent's second wife, Gladys P. Warren, filed a petition contesting the will and certain inter vivos transfers from Mr. Warren to Sherry. Gladys and Terry sought to have the will and the inter vivos transfers set aside.

¶2. Following a two-day bench trial, the Yalobusha County Chancery Court denied their petition. Gladys and Terry appeal from the chancery court's order.

¶3. The chancery court found that the will and the inter vivos transfers were valid; no confidential relationship existed between Mr. Warren and Sherry, either at the time of the inter vivos transfers or at the time the will was executed; and there was no evidence that Sherry had exerted undue influence over Mr. Warren. Finding no error, we affirm.[1]

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶4. Mr. Warren died at the age of eighty-seven. Terry and Sherry were Mr. Warren's children from his first marriage. When Mr. Warren died, he had been married to his second wife, Gladys, for about thirty-eight years. Gladys also had children from her first marriage.

¶5. Mr. Warren and his brothers were raised "with little or nothing." His formal education ended after the fifth grade. He started out working as a mechanic in two factories. Eventually, he began his own appliance repair business. Mr. Warren worked in that business for many years, becoming successful financially. His family uniformly described Mr. Warren as a very hard worker.

¶6. Gladys also described her husband as "high-strung" and acknowledged that she had filed for a divorce two times, once in 1998 and again in September 2016, ultimately dismissing both complaints. Terry testified that while he and Sherry were growing up, he and his father "didn't get along," and, according to Terry, Sherry was "all her mother's child."

¶7. Regarding Mr. Warren's finances, Terry testified that his father "cared about money

---

[1] In the course of appellate briefing, Gladys and Terry included in their record excerpts an "Exhibit A" that purported to summarize Mr. Warren's assets and the purported beneficiaries of those assets for the years 2011, 2014, 2016, and 2017. Sherry moved to strike Exhibit A. Gladys and Terry filed no response. We grant Sherry's motion to strike for the reasons addressed.

more than anything in the world." Sherry acknowledged that her father was "frugal" and "fond of money." She would always go to Terry, rather than her father, if she needed money. Terry, a successful businessman, similarly testified that "[ninety-nine] percent of the time," Sherry would go to him when she needed help financially, and he would help her all he could.

¶8. Terry and Sherry both testified that they knew they could not ask their father about his finances; he was "very private" about his assets. Mr. Warren's long-time accountant, Joseph Black Jr.; his lawyers, Daniel Martin and John J. Crow Jr. of the CrowMartin law firm; and his financial advisor, Justin Childress, all testified at trial. They likewise agreed that Mr. Warren was very private about his finances. Childress testified that Mr. Warren told him that "he did not trust his spouse and he preferred that [his financial information] be sent to his brother's [home;] that way he could access his statements there."

¶9. Although Terry acknowledged how private his father was about his assets, several witnesses at trial testified about how Terry would make remarks about his potential inheritance or how he would speculate about how much money his father had. For example, Terry's aunt, Glenda Warren, testified that any time there were family gatherings, "most of the time Terry would say, you know, 'Reckon how much money he's got?' . . . 'I am going to have a high ole time, you know, when that comes to me.'" Glenda said that Mr. Warren would react "[k]ind of solemnly" when he would hear Terry making these comments. Sherry's son, Charlie, corroborated Glenda's testimony and said that when his grandfather heard these kinds of comments, it "grated on his [grandfather's] nerves." Sherry testified that

3

she would tell her father that Terry was only joking when he made these remarks, but her father "didn't appreciate it."

## I. The Power of Attorney and the Inter Vivos Transfers

¶10. In 2009, Mr. Warren executed a power of attorney in Sherry's favor. Sherry testified that she did not know he was going to have such a document prepared. She said that he just brought it to her office one day. She and her father never talked about it. Sherry "thought Power of Attorney meant that when something happened to my daddy that it was up to me to take care of any, you know, any loose ends or whatever." Sherry further testified, "It never occurred to me that I could have actually acted on my dad's behalf in anything."

¶11. Childress was a certified financial planner with Cetera (Regions Investment Solutions)[2] during the relevant 2014-2018 time period. He was introduced to Mr. Warren in early 2014, and they had some introductory conversations about financial planning and the offerings Cetera had regarding investments or insurance. In late March 2014, Mr. Warren had a Regions IRA CD that was maturing. Childress assisted Mr. Warren in transferring the assets to a Cetera IRA that invested in a Lincoln fixed index annuity that would have a higher rate of return. Mr. Warren also purchased a whole life insurance policy with Prudential around that same time and named Gladys, Terry, and Sherry as beneficiaries.

¶12. Later, in mid-2016, Mr. Warren "popped into" Childress's office to generally discuss distributing assets to his children. Mr. Warren was alone at the time. They discussed different account types and the tax implications for distributing. Childress testified,

[2] The marketing name for Cetera is Regions Investment Solutions, which is a subsidiary of Regions Bank.

4

"Specifically, we talked about the insurance policy, his IRA, and the tax consequences of distributing from the IRA."

¶13. Then, about a year later (mid-2017), Mr. Warren returned to Childress's office by himself, and he "specifically said that he had an annuity that was not under [Childress's] purview and he wanted to gift it to Sherry, his daughter." Childress testified that he and Mr. Warren "talked about gifting an annuity, and what the tax consequences of that could be." Childress told Mr. Warren that "if [the instrument] was a nonqualified annuity and he gifted the annuity, then there would be a tax consequence to him." Mr. Warren asked how those tax consequences could be avoided. Childress told him that he could choose to leave it to someone who would receive it at his death, and "they would accept the tax consequence at that point." Childress said that Mr. Warren did not make a decision about what he would do at that meeting.

¶14. The next time Childress met with Mr. Warren was on July 19, 2017. Sherry testified that on that day, her father called her and told her that he wanted her to go to Regions Bank with him and asked her to meet him at a convenience store between Water Valley and Oxford, Mississippi. After meeting there, the two rode together and met with Childress at the Regions Bank in Oxford. Sherry had not met or talked to Childress before. Sherry said that at the meeting, her father said to Childress, "I've got some money that I want to transfer to my daughter's name." She was "surprised" by this statement, "but [her father] was in charge," and she "was just sitting there." Sherry testified that her father said, "I've thought about this a lot. This is what I want to do." Sherry testified that she never asked her father

for anything from his estate or had any discussions with him about an inheritance.

¶15. Childress corroborated Sherry's testimony about the transfer. He testified that when Mr. Warren told him that he wanted to transfer his Symetra annuity to Sherry, he downloaded the Owner Change Request form, completed the form with the information Mr. Warren gave him, and both Mr. Warren and Sherry signed the form before the branch manager who was authorized to provide a Medallion Signature Guarantee. Childress testified that Sherry had to be present to sign the form, and the only "role" she played in the meeting was to sign the form and accept the new ownership of the assets. Childress confirmed that Sherry did not advise her father or do anything of this nature during the meeting. He had no concern about Mr. Warren making the transfer, whether Mr. Warren understood what he was doing, or whether Sherry was directing him to do so. Childress confirmed that Mr. Warren exercised independent consent and judgment in this transaction. As addressed in more detail below, Childress prepared a memorandum concerning the meetings he had with Mr. Warren over the years. He memorialized the meeting concerning the transfer of the Symetra annuity as follows:

> During the process of completing the paperwork [(to transfer the Symetra annuity)], Mr. Warren expressed concerns (Mistrust) about his son, Terry. He stated "Terry said he is going to have a party when I die, and Terry said he is going to use the money he inherited from me to thro[w] this party." Mr. Warren also said that "Terry had plenty and didn't need anything other than what he leaves to him from being beneficiary on his other policies." He relayed to me several times that he wanted to get this money ([the] Non-Qualified Symetra Annuity) out of his name and he wanted Sherry to have it.

¶16. On January 10, 2018, Mr. Warren and Sherry established a joint checking account at Regions Bank. Sherry testified that her father wanted to establish this account so that the

6

funds deposited in it could be used to pay the taxes and penalties relating to the transfer of the Symetra annuity. According to Sherry, her father knew about these tax consequences, but she did not, although she thought there may have been a phone call about it.[3] Mr. Warren and Sherry both signed the checking account signature card. The account was funded with $37,000 from one of Mr. Warren's IRAs. Sherry testified that she established the joint checking account with her father because that is what he wanted and "instructed her to do so." She said that her father wanted the separate joint account with her because he did not want Gladys to find out about the annuity transfer or the joint checking account established to pay the taxes.

¶17. Childress also testified about Mr. Warren and Sherry establishing the joint checking account. He said that they both came into his office one day to facilitate funding the Regions checking account that Mr. Warren and Sherry opened. Childress testified that it was Mr. Warren's decision to make this transfer. Childress "never" had any concern about whether Mr. Warren was acting independently in making this decision or whether he was being influenced by Sherry or anyone else.

¶18. Although Mr. Warren typically had Black prepare his income taxes, he told Sherry he did not want Black to prepare his tax returns for 2017 "because [Black] was friends with Terry." Mr. Warren did not want anyone to know about the tax consequences he had incurred. So Sherry had Mr. Warren's 2017 tax returns prepared by Alex Sanders, a CPA,

---

[3] Although Sherry thought she was not present when Childress explained the tax consequences to Mr. Warren, Childress's recollection was that both Mr. Warren and Sherry came into his office one day when he talked to Mr. Warren about the tax consequences.

based on the information her father gave to her. Sherry said that Sanders explained to her that she could use her power of attorney to file Mr. Warren's 2017 income tax and gift tax returns without him having to be there. Sanders told her she just needed to bring a copy of her father's driver's license and have his social security number, so that is what she did. Per her father's instructions, Sherry paid the taxes from the joint checking account she and her father had established. Because she did not feel that the money remaining in the account after paying the taxes was "her cash," Sherry withdrew the money left over in the account and took it to Freeland (her lawyer).

## II.    Mr. Warren's Wills

¶19.    In 2011, when Martin was a young lawyer with the CrowMartin law firm, Mr. Warren came to him and asked him to prepare a will for him, which Martin did. The 2011 Will left a $100,000 cash bequest to Terry, Warren's pickup truck to Sherry, and the remainder of Warren's testamentary estate, both real and personal, to Gladys and Sherry in equal parts. Martin advised Mr. Warren about the advantages of avoiding probate by using self-directed instruments such as CDs, IRAs, and other bank accounts. Martin's notes from that meeting show that $766,000 of Mr. Warren's assets would pass after his death directly to the beneficiaries indicated on the particular instruments.

¶20.    In December 2016, Mr. Warren executed a new will. Martin's law partner, John Crow, prepared the 2016 Will and it was witnessed by Martin and Crow. It reduced Terry's $100,000 specific bequest to $5,000 and made Sherry the executor, rather than Terry. Sherry testified that her father came to the office where she worked "so upset" about remarks Terry

8

had made earlier that day in front of "some big shots" about how he was going to have a "$95,000 fish fry" when his father (Mr. Warren) died. According to Sherry, her father said, "I don't like it one damn bit . . . I'm fixing to take him out [of my will]."

¶21. Mr. Warren wanted Sherry to go to Crow's office with him, but she told him she could not leave work to go with him. So her father told her to "[s]tart writing," and he had her write down the changes he wanted, which she did.[4] She signed her name at the bottom "so people would know that she wrote it." Mr. Warren took the handwritten notes,[5] and Crow prepared the 2016 will in conformity with those notes. Crow confirmed that once the 2016 Will was drafted, Mr. Warren was called to come into the office and execute it.

¶22. Crow had "no doubt" that he went over the will with Mr. Warren and specifically confirmed that Mr. Warren understood that he was reducing Terry's bequest to $5,000 in Item I of the will. Martin and Crow witnessed the 2016 Will. Crow did not recall anybody else being in the room when Mr. Warren executed the will and testified that if there had been a potential heir, he would have asked the person to leave. Crow had "no question" that the 2016 Will was prepared based on Mr. Warren's independent knowledge and consent. Likewise, Martin, the other witness to the 2016 Will, did not question Mr. Warren's capacity to execute it.

¶23. Mr. Warren executed his final will on August 3, 2017. Crow also prepared this will,

---

[4] In addition to the changes described above, Sherry also wrote down that "Gladys Warren's children were to be excluded from will" and that the spelling of Sherry's last name be corrected.

[5] The record is unclear whether Mr. Warren or Sherry took the notes to Crow.

9

and its execution was again witnessed by Martin and Crow. Regarding the 2017 Will, Crow recalled Mr. Warren had told him that "Terry already had enough assets to—he had a lot of assets. Terry had done real well." Crow testified, "And I guess he wanted to kind of direct what he had to go to somebody who needed it more[,] . . . [and that was] [h]is daughter."

¶24. The 2017 Will differed from the 2016 Will as follows:

(1) it contained no specific monetary bequest to Terry;

(2) Item II specifically set forth that Mr. Warren and his wife (Gladys) owned their residence and real property located on Mississippi State Highway 32 in Yalobusha County "as tenants by the entirety with rights of survivorship. In the event my wife predeceases me, I do hereby give, devise, and bequeath such property to my son, Terry Warren." Item II further provided that the contents of the home would be distributed in the same manner;

(3) Item III specifically set forth that Mr. Warren had "a life insurance policy and an individual retirement account" that were not assets of his estate but would be distributed pursuant to their respective terms and conditions; and

(4) Item IV provided that the rest, residue, and remainder of Mr. Warren's estate, both real and personal, was to go to his daughter, Sherry.

¶25. Some of the changes from the 2016 Will were made pursuant to handwritten notes on the 2016 Will made by a former CrowMartin secretary, Lucinda Walton. These revisions included removing the specific monetary bequest to Terry and a reference to Mr. Warren's life insurance policy and IRA, both of which named Gladys, Terry, and Sherry as beneficiaries. Crow testified that Walton made these notes from instructions she received from Mr. Warren over the telephone, and he reviewed them.

¶26. Crow acknowledged that another handwritten note on the 2016 Will showed that the remainder of Mr. Warren's estate was to go to Gladys, and if Gladys should predecease Mr.

10

Warren, to Sherry. As noted, the final 2017 Will devised the remainder of Mr. Warren's estate to Sherry.

¶27. Crow confirmed that Sherry was not present when Mr. Warren executed his will. He acknowledged that his billing record showed there were phone calls to and from Sherry that day totaling .40 of an hour and another entry for .53 of an hour that included, among other tasks, a phone call to Sherry. Crow did not remember what was discussed on the telephone calls, nor did Crow specifically recall how the change in the residual clause in the will came about for revision. Crow testified, however, that he and Mr. Warren went over the entire will before Mr. Warren executed it.

¶28. Crow also confirmed that he had no concern that Sherry, or anyone else, was directing the disposition of Mr. Warren's estate,[6] and he had no concern that Mr. Warren lacked the testamentary capacity to execute his 2017 Will. Martin, the other attesting witness to the will, also testified that he "never questioned" Mr. Warren's capacity to execute his will. If either he or Crow had any doubts, they would not have allowed Mr. Warren to execute it.

### III.    Late November through December 2018

¶29. In late November 2018, Mr. Warren received a notice from the Social Security Administration (SSA) that was mailed to the Warren home. The notice provided that the SSA had been notified by the Internal Revenue Service that Mr. Warren had an adjusted

---

[6] Just as Crow confirmed at trial, he likewise confirmed in his October 7, 2020 deposition (taken over two years before the January 2023 trial) that Mr. Warren executed his 2017 Will based upon his own independent judgment: "There's no doubt in my mind that when he executed the [2016] and [2017] wills that's what he [(Mr. Warren)] wanted to do, and it was his idea."

11

gross income of $129,186.00 in 2017 (due to the Symetra annuity transfer). As a result, Mr. Warren's Medicare Part B premium would be increased, resulting in a reduction in his monthly Social Security payments for 2019. Gladys brought the SSA notice to Mr. Warren's attention, and she testified that he did not have any idea what it meant. Gladys said she was upset because "she thought it was identity theft," and she and Mr. Warren went to Black's office. Black testified that he told them that it looked like it "dealt with an IRA distribution." Black said that he asked Mr. Warren, "'Well, did you make a distribution or did you take a distribution from your IRA account?' He said 'No.'"

¶30. Gladys and Mr. Warren also met with Childress that day. Childress testified that Mr. Warren gave him permission to explain the Symetra transaction, so he did that; then Gladys asked for the documentation. Childress said that Mr. Warren never suggested or did anything to suggest that the money was taken without his authority. Mr. Warren did not talk much at all. The meeting was "driven by Gladys."

¶31. Gladys then showed Terry the notice, and Gladys, Terry, and Mr. Warren met with Childress a day or two after the first meeting. Childress testified that Terry directed this meeting. Mr. Warren "sort of had his head down" during the meeting and "[s]aid very little." Childress listened to Terry, and in response to Terry's request for documentation, Childress gave Mr. Warren a copy of his Prudential Life Insurance policy and the account information relating to Mr. Warren's Lincoln IRA. This was in addition to the Symetra annuity documentation he had already provided.

¶32. After Terry, Gladys, and Mr. Warren left Childress's office, Childress was "very

12

concerned" about "the direction [Mr. Warren] was receiving at that point," so he "filed a Vulnerable Adult Form with [his] back office." Childress was concerned because he thought Mr. Warren "was being controlled . . . [b]y Terry" from the way Terry "drove [the] meeting [and] was trying to extract information." Childress explained that he was required to file a Vulnerable Adult Form if he believes someone is trying to "control[] or . . . manipulat[e]" the financial assets of a client. Childress was specifically asked whether he had any such concern "over Sherry's controlling her father." He responded, "None."

¶33. After the meeting, Childress prepared notes about the recent meetings, as well as his recollection about the earlier meetings with Mr. Warren and the meeting with Mr. Warren and Sherry when the Symetra annuity was transferred.

¶34. Sherry testified that she had a phone conversation with her father during this time and learned that Terry and Gladys were upset about the transfers "and [they had] accused [her] of stealing money from him [(her father)]." Sherry admitted that when Terry asked about the SSA notice and the income identified in the notice, she "acted like she had no idea where it came from." She explained, "[My father] would have killed me had I acted any other way because he had sworn to not let them know anything because he knew he . . . would be in trouble." Sherry testified that for the same reason, her father "had to act dumb to cover his behind" when Black or anyone else asked him about the 2017 income. She said, "He knew the wrath that he was going to be under."

¶35. Terry and Gladys also took Mr. Warren to the CrowMartin law office. Martin said his law office prepared a revocation of the Power of Attorney, which Mr. Warren executed

13

on November 28, 2018. Martin confirmed that Mr. Warren had the capacity to execute the revocation at that time. In his October 2020 deposition, Crow said that based on information provided to him by Terry, he prepared the petition to establish a conservatorship for Mr. Warren that was filed the next day on November 29, 2018. The conservatorship was established on December 17, 2018, and terminated after Mr. Warren died less than two weeks later on December 30.

## IV. Mr. Warren's Physical Condition

¶36. The record reflects that Mr. Warren's mobility was affected in his later years. He had diabetes that was treated with insulin. He also took blood pressure medicine and a blood thinner. Dr. Mark Strong of Strong Heart Clinic was Mr. Warren's cardiologist. Dr. Strong's medical records indicate that Mr. Warren had an implantable cardioverter defibrillator (ICD) implanted in 2016 to address Mr. Warren's atrial fibrillation (episodes of irregular heartbeat). Following the ICD implant, Dr. Strong's medical records provide that Mr. Warren "underwent ICD implantation with good result," he "has done well since his ICD implant," and no problems were observed. Mr. Warren was hospitalized with a severe stroke on December 25, 2018, and died on December 30, 2018.

## V. Mr. Warren's Mental Condition

### A. Dr. Paul Odom

¶37. Dr. Odom testified for Gladys and Terry. He is a physician and board-certified in family practice. He testified about his prior experience, including twenty years working for the VA. He treated the elderly to a great extent, including those in the dementia ward.

¶38. Regarding Mr. Warren in particular, Dr. Odom testified that he and his partner Dr. George Abraham had been treating Mr. Warren for "several years." According to Dr. Odom, Mr. Warren had vascular dementia, "[a]nd over the years he was slowly declining." He believed that Mr. Warren's judgment and mental activity had probably been affected for "at least four or five [years]" before he died at the age of eighty-seven.

¶39. Dr. Odom based this observation on his treatment of Mr. Warren and review of the test results of a December 25, 2018 CT brain scan performed on Mr. Warren after his stroke. The brain scan report indicated that Mr. Warren had "several little strokes" prior to the severe stroke he had on December 25, 2018. Dr. Odom was asked whether he had an opinion about "how long [Mr. Warren] would have been unable to conduct business in a normal fashion." Dr. Odom replied, "Well, certainly, he would have been limited. I'm not an expert in that particularly, but I mean, it stands to reason with all of this going on in his brain, he would have had some difficulty in making decisions."

¶40. Dr. Odom admitted he had never done a formal neurological or psychological examination of Mr. Warren, but he explained that a patient is interviewed before every examination. He said that "in the course of the interview . . . we can pick up signs of intellectual decline, and[,] . . . in general, we can eventually decide [that] . . . they are declining and suspect dementia." With respect to Mr. Warren, in particular, Dr. Odom admitted there was no mention of dementia or diminished mental capacity in his medical records until Gladys brought Mr. Warren into his medical clinic on December 4, 2018, after Gladys learned a large amount of Mr. Warren's assets had been transferred to his daughter.

15

According to Dr. Odom, there were no prior entries mentioning a decline in Mr. Warren's mental capacity because none were directly entered into the computer system before the December 4 visit. He said that if a direct entry is not made by an attending physician regarding a particular category on the health and physical examination template, then the computerized office record system he used would default to normal.

## B. Dr. Frank Perkins

¶41. Dr. Perkins testified as an expert witness in Sherry's case. He was accepted by the Court, without objection, as an expert in forensic psychiatry. Dr. Perkins reviewed Dr. Odom's deposition and the medical records from Dr. Odom's and Dr. Strong's clinics. He also reviewed the depositions of Childress, Crow, and Martin and was present at trial during Gladys's testimony and Terry's cross-examination and redirect examination. Dr. Perkins opined with a reasonable degree of medical certainty that Mr. Warren had testamentary capacity during the July/August 2017 time period, and he found no evidence that Sherry exerted undue influence on her father at that time.

¶42. Dr. Perkins observed that neither Dr. Strong's medical records nor Dr. Odom's medical records showed any indication of a lack of mental capacity, dementia, or mental deterioration until the entry in Dr. Odom's records in December 2018. He questioned Dr. Odom's explanation for the lack of any such notation. In Dr. Perkins's opinion, as a standard medical practice, if Mr. Warren's physical or mental condition had been deteriorating, if he had been showing symptoms of dementia or a lack of mental capacity, that information should have been recorded in Dr. Odom's records, and those conditions should have been

treated at the time.

¶43. Regarding the December 25, 2018 CT brain scan, Dr. Perkins noted that there was no previous brain scan that could serve as a comparison to the 2018 scan, so the mini-strokes that are indicated on the 2018 scan could have happened within the last thirty days, or even the last thirty years. Dr. Perkins also explained that although a brain scan shows physical injury to the brain, that does not mean there is functional impairment. Other neurological tests or documentation about the patient's ability to function are relevant to the functional impairment aspect, and that documentation was not present in the medical records.

### C. Other Testimony

¶44. Terry testified about a few incidents when his father became disoriented that happened over the years from about 2011 until the time he died. Sherry, however, testified that her father "was diabetic and had low blood sugar," which could have caused his confusion. Sherry testified she had never seen her father act as though he had suffered a stroke before his severe stroke in December 2018. She said that if she had, she and Terry would have done something about it.

### VI. Mr. Warren's Death and Ensuing Litigation

¶45. After Mr. Warren died, Sherry filed a petition to admit the 2017 Will to probate and sought issuance of letters testamentary. Gladys and Terry subsequently filed a "Petition to Set Aside Certain Inter Vivos Transactions and for Contest of Will," alleging that Sherry had unduly influenced her father to make the inter vivos transfers and to execute his 2017 Will. Gladys and Terry requested that the inter vivos transfers be set aside and that the 2017 Will

17

"be set aside as null and void and without any legal effect as a result of its execution under circumstances encompassing undue influence and/or lack of testamentary capacity."

¶46. After a two-day bench trial, the chancellor entered her "Opinion and Order" on March 27, 2023, denying Gladys and Terry's petition and finding "that the 2017 and 2018 inter vivos transfers were valid and that the 2017 will is valid." The chancellor found that "a confidential relationship did not exist between [Sherry] and [her father] at the time of the inter vivos transfers," nor did the chancellor find evidence of undue influence. The chancellor further found that Mr. Warren had the requisite mental competency and testamentary capacity to transfer his assets at the time the inter vivos transfers were made.

¶47. The chancellor also found that at the time the 2017 Will was created and executed, "there did not exist a confidential relationship between [Sherry] and [her father,] . . . [and] [t]here appears to be no evidence of undue influence between [Sherry] and [her father]."

¶48. Additionally, the chancellor found that Mr. Warren had the mental competency and capacity to execute the 2017 Will.

¶49. Gladys and Terry appealed.

### VII. Post-Appeal Motion to Strike

¶50. When Gladys and Terry filed their appellants' brief and record excerpts, they included in their record excerpts an "Exhibit A," and they refer to Exhibit A in their appellants' brief. Exhibit A is a four-page document of four charts showing Mr. Warren's assets in 2011, 2014, 2016, and 2017 and the beneficiaries of these assets at these points in time.

¶51. Sherry moved to strike Exhibit A because it was not an exhibit at trial or presented in

18

any other way at trial, stating it "is a purported summary of the decedent's assets without any supporting documentation," and "[t]he Appellee was denied an opportunity to determine the accuracy of Exhibit A or to challenge its admission at trial."

¶52. Gladys and Terry did not respond to the motion to strike.

¶53. On December 20, 2023, the Mississippi Supreme Court ordered that the motion to strike "be passed for consideration on the merits of the appeal." Order, *Warren v. Maharrey* (*In re Est. of Warren*), No. 2023-CA-00438-COA (Miss. Dec. 20, 2023). We dispose of Sherry's motion to strike below.

## THE MOTION TO STRIKE EXHIBIT "A"

¶54. We find that Exhibit A included in Gladys and Terry's record excerpts should be stricken and will not be considered on appeal. We find nothing in the record or the trial transcript indicating that Exhibit A was entered into evidence at trial or presented to the chancellor in any way. Gladys and Terry refer to Exhibit A in their appellants' brief and represent that Exhibit A had been "previously produced in similar form as an exhibit to Petitioners' Proposed Findings of Fact and Conclusions of Law." But the "Petitioners' Proposed Findings of Fact and Conclusions of Law" does not appear to have been filed with the chancery court clerk, nor was it designated as part of the record on appeal, as required by Mississippi Rule of Appellate Procedure 10. In this regard, Rule 30(a) specifically provides that "[a]ppeals shall be on the record *as designated pursuant to Rule 10*." M.R.A.P. 30(a) (emphasis added). In short, we strike Exhibit A because "Mississippi appellate courts may not consider information that is outside the record." *Hatfield v. Deer Haven*

*Homeowners Ass'n Inc.*, 234 So. 3d 1269, 1273 (¶12) (Miss. 2017).

¶55. We further note that although Exhibit A is a purported summary of financial documents or records, Gladys and Terry do not identify what records the information is based upon or whether such documentation is in the record. Even if any of this documentation is in the record, Gladys and Terry failed to cite the record in support of the information in the charts, as is their obligation pursuant to Mississippi Rule of Appellate Procedure 28(a)(7). "It is not the obligation of this Court to independently search the record front to back to ferret out those facts that would bear on the issue." *Little v. State*, 744 So. 2d 339, 346 (¶28) (Miss. Ct. App. 1999); *see* M.R.A.P. 28(a)(7). We grant Sherry's motion to strike for this additional reason.

## STANDARD OF REVIEW

¶56. On appeal, we "will not disturb the findings of a chancellor when supported by substantial credible evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Est. of Johnson v. Johnson*, 237 So. 3d 698, 704 (¶14) (Miss. 2017). "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made." *Varvaris v. Kountouris (In re Est. of Varvaris)*, 528 So. 2d 800, 802 (Miss. 1988). So long as "the [c]hancellor's findings are supported by substantial, credible evidence in the record," the chancery court's decision "will not [be] reverse[d]." *Id.*

¶57. The appellate court "will not substitute its judgment for that of the chancellor even

20

if [it] disagrees with the lower court on the finding of fact and might arrive at a different conclusion." *Owen v. Owen*, 798 So. 2d 394, 397-98 (¶10) (Miss. 2001) (citation and internal quotation marks omitted). Further, "[w]hen no specific findings appear in the record, [an appellate court] generally presumes that the chancellor resolved all such fact issues in favor of the appellee." *Id.* (citation and internal quotation mark omitted).

**DISCUSSION**

¶58.    Gladys and Terry assert that the chancellor committed "clear, manifest error" in determining that the inter vivos transfers and the 2017 Will were valid based upon the chancellor's findings that (i) no confidential relationship existed between Sherry and Mr. Warren; (ii) there was no evidence of undue influence between Sherry and Mr. Warren; and (iii) Mr. Warren had the requisite mental competency and testamentary capacity when he made the inter vivos transfers and executed his 2017 Will.[7] Finding no "clear error" on the chancellor's part, we affirm the chancellor's judgment for the reasons addressed below.

### I.    Confidential Relationship

¶59.    Mississippi law on confidential relationships and undue influence is well settled and applies "to both inter vivos and testamentary transactions." *Wright v. Roberts*, 797 So. 2d 992, 998 (¶16) (Miss. 2001). In this case, we must address the validity of both types of

---

[7] We note that Gladys and Terry assert that several other findings made by the chancellor are also erroneous, namely that the chancellor erred in finding that Sherry "never used her power of attorney during the events at issue"; Sherry's "actions were the direct result of her father's instructions"; and Sherry "was not involved in the preparation of the 2016 and 2017 Wills." These findings relate to the three primary findings set forth above and will be addressed in context, except for Gladys and Terry's assertion regarding the 2016 Will. It is not necessary to address this assertion because we find that the 2017 Will that Sherry presented for probate is valid.

21

transactions: (1) the inter vivos transfers from Mr. Warren to Sherry and (2) Mr. Warren's bequests to Sherry in the 2017 Will. In the context of a confidential relationship, this distinction is important "because the rules of law are different regarding gifts bequeathed by will and inter vivos gifts when a confidential relationship exists between the parties." *In re Caspelich*, 22 So. 3d 1199, 1205 (¶19) (Miss. Ct. App. 2009) (citing *Madden v. Rhodes*, 626 So. 2d 608, 618 (Miss. 1993)).

¶60. In both situations, Gladys and Terry, as the parties "asserting that a confidential relationship exists[,] [have] the burden of establishing such a relationship by clear and convincing evidence." *Foster v. Ross*, 804 So. 2d 1018, 1023 (¶15) (Miss. 2002); *In re Caspelich*, 22 So. 3d at 1205-06 (¶20). In the will context, if the contestant shows that a confidential relationship existed between the testator and the beneficiary, "a presumption of undue influence only arises . . . when there has been some abuse of the confidential relationship, such as some involvement in the preparation or execution of the will." *Madden*, 626 So. 2d at 618. "On the other hand, with a gift inter vivos, there is an automatic presumption of undue influence even without abuse of the confidential relationship. Such gifts are presumptively invalid." *Id.* If a confidential relationship is proved, "[t]he burden shifts then to the one who wishes to uphold the gift to rebut the presumption by clear and convincing evidence." *In re Caspelich*, 22 So. 3d at 1205 (¶19).

¶61. The Mississippi Supreme Court has generally described a confidential relationship as one in which "there is a relation between two people in which one person is in a position to exercise a dominant influence upon the other because of the latter's dependency upon the

22

former, arising either from weakness of mind or body, or through trust . . . ." *Madden*, 626 So. 2d at 617 (emphasis omitted) (quoting *Hendricks v. James*, 421 So. 2d 1031, 1041 (Miss. 1982)). "The dependency factor was emphasized again when we stated, 'In determining whether or not a fiduciary or confidential relationship existed between two persons, we have looked to see if one person depends upon another.'" *Id.* (quoting *Varvaris v. Kountouris* (*In re Will & Est. of Varvaris*), 477 So. 2d 273, 278 (Miss. 1985)).

¶62. Factors the courts consider in determining whether a confidential relationship exists include:

> (1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has their medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and another.

*In re Est. of Dabney*, 740 So. 2d 915, 919 (¶12) (Miss. 1999).

¶63. With respect to both testamentary gifts and inter vivos transfers, *if* "the presumption of undue influence . . . [is] established, [then] the burden of proof shifts to the beneficiary/grantee to show by clear and convincing evidence that the gift was not the product of undue influence." *Wright*, 797 So. 2d at 998 (¶16). The beneficiary/grantee must show: "(1) good faith on the part of the grantee/beneficiary; (2) grantor's/testator's full knowledge and deliberation of his actions and their consequences; and (3) independent consent and action by the grantor/testator." *Id.* at 999 (¶23). As we address below, we find in this case that "the initial requirement, that of a confidential or fiduciary relationship, has

not been met"; thus, "[a] further discussion of these tests is not necessary." *Smith v. Smith*, 574 So. 2d 644, 651 (Miss. 1990).

¶64.    In her order denying Gladys and Terry's petition contesting the validity of the inter vivos transactions and the 2017 Will,[8] the chancellor found that no confidential relationship existed between Sherry and her father when the inter vivos transfers were made in July 2017 (Symetra annuity) and January 2018 (joint checking account) or when Mr. Warren executed his will in August 2017. We find no error in her findings.

¶65.    As we have noted, the overriding concern in assessing whether a confidential relationship exists is whether "one person is in a position to exercise a dominant influence upon the other because of the latter's *dependency upon the former*, arising either from weakness of mind or body, or through trust . . . ." *Madden*, 626 So. 2d at 617 (emphasis added). Here, the chancellor specifically found that "based upon everyone's testimony[, Mr. Warren] was not reliant on [Sherry]." Upon review, we find that substantial evidence supports this overall finding, as addressed in more detail below.

¶66.    In examining the individual *Dabney* factors, the chancellor began by recognizing that Mr. Warren executed a power of attorney in Sherry's favor in 2009. The chancellor then observed that "'[t]he existence of a power of attorney is but one factor to consider in determining whether a confidential relationship exists.'" (Quoting *Dent v. Roberts* (*In re Est. of Grantham*), 609 So. 2d 1220, 1223-24 (Miss. 1992)). The chancellor addressed this factor

---

[8] Although no mention was made of the 2016 Will in their petition before the chancery court, Gladys and Terry also challenge the validity of the 2016 Will on appeal. Because we find that the 2017 Will is valid, we need not address this issue and do not do so.

in the context of the inter vivos transfers (the Symetra annuity and the joint checking account), finding that Sherry "testified that she was unaware of the power of attorney when it was created and that she never used it in any way, nor was there any testimony or evidence that she used it." To be precise, Sherry testified that unbeknownst to her, her father had the power of attorney prepared and brought it to her at work. Sherry testified that "[i]t never occurred to [her] that [she] could have actually acted on [her] dad's behalf in anything."

¶67. Gladys and Terry assert that the chancellor erred by finding "[t]hat Maharrey never used her power of attorney during the events at issue," but the "events at issue" were the Symetra annuity transfer and the joint checking account that Sherry and her father set up at Regions Bank. Based upon our own review, we find that the chancellor correctly determined that Sherry did not use the power of attorney with respect to these transfers. Nor did Sherry use the power of attorney in connection with the 2017 Will. As such, we find that Gladys and Terry's assertion on this point is unpersuasive.

¶68. The record reflects that the only time Sherry used the power of attorney was when Sanders told her she could use it to file her father's 2017 income tax and gift tax returns without him having to be there, so she did so. In this regard, the record also reflects that Sherry asked Sanders to prepare and file the 2017 tax returns in accordance with her father's instructions, and Mr. Warren furnished Sherry with the information used to prepare the tax returns that she gave to Sanders. Under these circumstances, we find no error in the chancellor's finding on the power of attorney factor.

¶69. With respect to the remaining *Dabney* factors, the chancellor found that Sherry "did

25

not provide [her father] with transportation nor was his medical care and day-to-day activities controlled by her, although she did accompany him to the doctor sometimes when she could be off work." To be sure, Mr. Warren was of an advanced age (85 or 86) during the relevant time period, but his health was not particularly poor for a man of his age, and although he had some mobility issues, he was not wheelchair-bound or physically incapacitated. More importantly, there is no evidence that he was dependent on Sherry for caregiving. Like the chancellor, we find it significant that there is no evidence Mr. Warren depended on *Sherry* to meet his medical or caregiving needs, thus supporting the chancellor's finding that no confidential relationship existed between them. *Cf. In re Will & Est. of Varvaris*, 477 So. 2d at 279 (finding the chancellor "manifestly in error" in finding a confidential relationship existed between a father and his son where, although the testator was "of advanced years living in a nursing home [and] . . . undoubtedly dependent upon others[,] . . . there is no proof in this record that [the testator] *looked to* [*his son*] to care for his personal needs, to tend to him, or to handle his affairs" (emphasis added)).

¶70. Regarding Sherry's relationship with her father, although she testified that she loved him, she did not testify that she had a close relationship with him. Terry's testimony shows that Sherry and her father were not particularly close. Terry testified that Sherry was "her mother's child" growing up and, as an adult, when Sherry needed financial assistance, she would go to Terry "[ninety-nine] percent of the time," and he would help her all he could.

¶71. Moving to the next *Dabney* factor, although Sherry and her father established a joint checking account that was funded by a portion of one of Mr. Warren's IRAs, the chancellor

found that "everything [Sherry] did was at the Deceased's instructions. This comports with the testimony of all who were familiar with the Deceased and his behavior in regards to control of his financial affairs." Ample testimony at trial supports this finding. All witnesses questioned about Mr. Warren's financial affairs testified that he was "very private" about his finances, and Sherry testified that her father wanted to establish this separate joint account so that Gladys would not know about it. Further, we find no evidence that Sherry used the joint account to dominate or control her father. On the contrary, Sherry testified that she used the funds to pay Mr. Warren's 2017 income and gift taxes per his instructions. Regarding the money that remained in the account after paying Mr. Warren's taxes, Sherry testified that she did not feel that it was "her cash," so she withdrew the remaining cash in the account and took it to her lawyer.

¶72.  The chancellor found that Childress's testimony "corroborate[d] [Sherry's] version of the transactions," as follows:

> [Childress] testified the Deceased came in to see him in 2016 and 2017 alone to discuss transferring [the Symetra annuity] to [Sherry] and to discuss the tax consequences. Although [Sherry] did participate in meetings[,] this was after the initial conversations between Mr. Childress and the Deceased where he [(Mr. Warren)] declared his intent to transfer the annuity to [Sherry]. Mr. Childress also testified that he never had any doubts that the Deceased was not being influenced or coerced into making th[ese] transfers, nor did he doubt his mental capacity and understanding of the transactions, including the 2018 transfer of funds to pay taxes.

¶73.  Regarding the 2017 Will, the chancellor found that at the time of its creation (August 2017), no confidential relationship existed between Sherry and her father, which we find is supported by the reasoning detailed above and substantial evidence in the record.

¶74.    Further, the chancellor observed that "[i]n a will contest, a confidential relationship alone does not give rise to the presumption [of undue influence].  Rather, 'there must also be an abuse of that relationship relating to the execution of the will.'" (Quoting *Costello v. Hall*, 506 So. 2d 293, 298 (Miss. 1987)).  In this regard, the chancellor recognized "that the presumption of undue influence arises if the contestant proves 'a confidential relationship *and suspicious circumstances in the execution of a* [*w*]*ill*.'" (Quoting *Davion v. Williams*, 352 So. 2d 804, 805 (Miss. 1977) (emphasis added by chancellor)).  On this point, the chancellor found that "[Sherry's] testimony indicated that she did not have anything to do with the preparation of the will other than call to ask for the costs at the Deceased's request. Her phone call is reflected in the office's billing."

¶75.    Sherry's testimony is corroborated by Crow's testimony, which the chancellor found "indicated that [Sherry] was not present at the creation of the 2017 will and that the Deceased was fully aware of what he was doing."  Crow testified that he and Mr. Warren talked about his will and went over the entire will before Mr. Warren executed it.  Crow had no concern that Sherry or anyone else was directing the disposition of Mr. Warren's estate.

¶76.    Based on these findings, the chancellor found that there was no confidential relationship between Sherry and her father.  The chancellor also found that there were no "suspicious circumstances" surrounding the execution of the 2017 Will, though such a finding was not required because the contestants did not prove that a confidential relationship existed between Sherry and her father.  *See, e.g.*, *In re Est. of Williams*, 379 So. 3d 968, 982 (¶50) (Miss. Ct. App. 2024) ("To reiterate, '[the] presumption of undue influence [arises if

28

the contestant proves] a confidential relationship and suspicious circumstance[s] in the execution of a [w]ill.'" (quoting *Davion*, 352 So. 2d at 805)). "The chancellor has the sole responsibility to determine the credibility of witnesses and evidence, and the weight to be given each." *Est. of Johnson*, 237 So. 3d at 714 (¶48). And "[b]ecause the chancellor is the only one to hear the testimonies of the witnesses and observe their demeanor, [she] is in the best position to judge their credibility." *Ellzey v. McCormick*, 17 So. 3d 583, 589-90 (¶26) (Miss. Ct. App. 2009) (quoting *Frazier v. Shackelford* (*In re Estate of Carter*), 912 So. 2d 138, 143 (¶18) (Miss. 2005)). Like the supreme court in *Est. of Johnson*, we "[y]ield[] to this discretion and find[] that the chancellor's analysis was sound." *Id.* Accordingly, we find that the chancellor did not err and certainly did not "clearly err," in finding that no confidential relationship existed between Mr. Warren and Sherry when the inter vivos transfers and execution of the 2017 Will took place.

## II.     Undue Influence

¶77.    Absent a showing that a confidential relationship existed between the grantor/testator and the beneficiary, "undue influence must be proved from the evidence without the benefit of any presumption." *Greenlee v. Mitchell*, 607 So. 2d 97, 105 (Miss. 1992); *In re Est. of Pigg*, 877 So. 2d 406, 411 (¶25) (Miss. Ct. App. 2003). In this regard, "[a] will is said to be the product of undue influence when an adviser has been so importunate as to subdue the testator's will and free agency." *In re Est. of Pigg*, 877 So. 2d at 411 (¶24).

¶78.    The chancellor found that there was no evidence of undue influence in this case. We agree. Indeed, the "best evidence" on the undue influence issue—the testimonies of

29

independent witnesses present at the time of the inter vivos transfers (*e.g.*, Childress) and the execution of the 2017 Will (e.g., Crow and Martin), *see id.* at 414 (¶36), confirms that Mr. Warren undertook these transactions independently without direction or influence from Sherry or anyone else. We certainly find no evidence in the record that Sherry had been so unremitting and so "importunate" that she "subdued [her father's] will and free agency" in the procuring and execution of the 2017 Will or with respect to the inter vivos transfers. *Id.* at 411 (¶24). As such, and bearing in mind our limited standard of review, we find no error in the chancellor's finding that there had been no showing of undue influence in this case.

### III. Mental Capacity to Make Inter Vivos Transfers

¶79. Gladys and Terry assert that the chancellor erred in finding that Mr. Warren had the requisite mental capacity when he made the inter vivos transfers to Sherry. They assert the chancellor failed to properly consider the testimony of Dr. Odom or family members concerning his mental capacity, and the chancellor improperly considered Childress's testimony in concluding that Mr. Warren was not mentally incapacitated. We find this assignment of error without merit for the reasons addressed below.

¶80. To prove mental incapacity, the contestants must show "that the person either (1) did not understand the legal consequences of his actions; (2) suffered from a general weakness of intellect with either inadequate consideration given for the transfer, or a confidential relationship; or (3) suffered from permanent insanity up to and after the date of execution." *Anderson v. Wiggins*, 331 So. 3d 1, 9 (¶23) (Miss. 2020) (citations and internal quotation marks omitted) (reversing summary judgment in contestant's favor where fact issue remained

30

whether decedent lacked the mental capacity to transfer funds to his girlfriend prior to his death); *see Van Quinn v. Quinn*, 278 So. 3d 1160, 1166 (¶23) (Miss. Ct. App. 2019) (finding that contestant failed to present sufficient evidence that decedent lacked the mental capacity to properly transfer his property six days before his death). In this case, there is no assertion that Mr. Warren suffered from permanent insanity; thus, we need only examine the first two factors of the mental-incapacity test. In doing so, we recognize that "the critical time for determining capacity is the transfer date." *Id.*

¶81. Gladys and Terry appear to assert that the chancellor erred because she did not consider the testimony of Dr. Odom or family members in concluding that Mr. Warren had the requisite mental capacity to make the transfers—but this is incorrect. The chancellor found:

> In regards to the Deceased's competency at the time of the transfer[,] the Petitioners rely on the testimony of the Deceased's physician, Dr. Paul Odom, and some instances of behavior that caused concern. Terry Warren testified to [four] instances where the deceased suffered an episode of forgetfulness or odd behavior. These instances occurred over a period of many years before the disputed transaction. Dr. Odom testified that the Deceased suffered from vascular dementia and there was no doubt he would have been limited in his last [four to five] years, yet Dr. Odom also testified that he had never conducted any mental evaluation of the Deceased because he did not have a reason to until 2018 when everyone noticed a marked difference in him, nor do Dr. Odom's own records reflect any kind of diminished capacity. Based upon this testimony and the lack of any medical diagnosis[,] the Court does not find that the deceased was incompetent and lacked the capacity to conduct his own affairs.

¶82. The chancellor plainly considered both Dr. Odom's testimony and Terry's testimony regarding instances when Mr. Warren appeared confused and found that evidence insufficient to show lack of mental capacity on Mr. Warren's part. We agree and find no

31

error in this determination as discussed below.

¶83.    Gladys and Terry assert that the chancellor erred in relying on the fact that there had been no prior entry in Dr. Odom's medical records concerning Mr. Warren's mental decline. They point out that Dr. Odom explained that his medical records did not reflect this information because no direct entry had been made by the attending physician on this factor, so the computerized medical records system that he used simply defaulted to "normal."

¶84.    But Dr. Perkins questioned Dr. Odom's explanation and opined that as a standard medical practice, if Mr. Warren had been showing symptoms of dementia or a lack of mental capacity, that information should have been recorded in Dr. Odom's records, and treatment for those conditions should have been explored.

¶85.    We find that Dr. Perkins's analysis makes sense in light of Dr. Odom's testimony as a whole.  As the chancellor noted, Dr. Odom testified that Mr. Warren's mental capacity had been limited during the last four to five years of his life.  Dr. Odom also testified that every time a patient came into his office "we have to interview them and exam them."  He said that in "the course of the interview, . . . they have to express themselves and we can pick up signs of intellectual decline, and sometimes we can pick it up quickly and sometimes it takes longer.  But, in general, we can eventually decide [that] . . . they are declining and suspect dementia."  Dr. Odom also testified about his twenty years of experience working for the VA, including treating patients in the dementia ward.  If that is the case, it is not unreasonable to expect that at some point a notation about Mr. Warren's mental capacity would have been entered in the four or five years prior to his severe stroke and death if Dr. Odom had

observed any such decline.

¶86.    Gladys and Terry also assert that the chancellor erred by not considering the December 25, 2018 CT brain scan taken after Mr. Warren suffered his severe stroke. But the chancellor heard the testimonies of both Dr. Odom and Dr. Perkins about the CT brain scan. The chancellor is presumed to have considered and resolved any finding related to it "in favor of the appellee." *Owen*, 798 So. 2d at 398 (¶10). Dr. Odom said that the CT brain scan indicated that Mr. Warren had suffered "several little strokes" prior to his December 25, 2018 stroke, but he admitted he "was no expert" on how that may have affected whether Mr. Warren could have been able to conduct business in a normal fashion. In contrast to Dr. Odom's testimony, Dr. Perkins explained that without any other CT brain scan to serve as a comparison, there was no way to tell when any prior "mini-strokes" had occurred. They could have occurred thirty days ago or thirty years ago. Further, Dr. Perkins explained that even where a brain scan shows physical injury to the brain, that does not mean there had been functional impairment. Dr. Perkins explained that although there are other neurological tests to assess a patient's mental capabilities, these tests had not been performed in this case. We do not find the chancellor in error simply because she did not specifically mention the brain scan in her findings.

¶87.    Additionally, Gladys and Terry assert that the chancellor erred in citing to Childress's testimony regarding Mr. Warren's state of mind at the time of the transfers. We disagree. Neither Terry nor Dr. Odom were present when Mr. Warren decided to make the transfers or when the transfers were made. In contrast, Childress *was* present, and we find that the

33

chancellor properly considered his testimony. *See Anderson*, 331 So. 3d at 10 (¶29) (recognizing that "the critical date for determining [the donor's] capacity to transfer his funds is the transfer dates").

¶88. As detailed above, Childress testified about his meetings with Mr. Warren, Mr. Warren's decision to transfer the Symetra annuity to Sherry, and his decision to fund the joint checking account with one of his IRAs. Summarizing Childress's testimony on this point, the chancellor found that "Childress . . . testified that he never . . . doubt[ed] [Mr. Warren's] mental capacity and understanding of the transactions, including the 2018 transfer of funds to pay taxes." Childress testified that he generally explained to Mr. Warren about the tax consequences of transferring the Symetra annuity as a gift, and "he [(Mr. Warren)] wanted to give it to Sherry then. He didn't want to wait until his passing to give her the money. That was his entire M.O." Likewise, Childress testified that "[Mr. Warren] knew very well what he was doing and what he needed to do" with respect to funding the joint checking account in order to pay the tax consequences.

¶89. In sum, we find no error in the chancellor's finding that the evidence presented failed to show that Mr. Warren was incompetent or lacked the mental capacity to conduct his own affairs at the time of the inter vivos transfers—i.e., the evidence failed to show that Mr. Warren did not understand the legal or tax consequences of his actions, or "suffered from a general weakness of intellect" when he made the transfers. *Anderson*, 331 So. 3d at 9 (¶23). We therefore find that this assignment of error is without merit.

### IV. Testamentary Capacity to Execute the 2017 Will

¶90.    Gladys and Terry assert that the chancellor erred in finding that Mr. Warren had the requisite testamentary capacity to execute his 2017 Will on August 3, 2017.  For the reasons addressed below, we find no error in the chancellor's finding on this issue.

¶91.    The ultimate "burden of persuading the trier of fact on the issues of due execution and testamentary capacity rests on [the] proponent throughout and never shifts to the contestants. That burden of persuasion is subject to the familiar preponderance of the evidence standard." *In re Est. of Pigg*, 877 So. 2d at 413 (¶32) (quoting *Clardy v. Nat'l Bank of Commerce of Miss.*, 555 So. 2d 64, 66 (Miss. 1989)).  Whether the testator has testamentary capacity is examined "at the time of the will's execution." *Noblin v. Burgess*, 54 So. 3d 282, 291 (¶32) (Miss. Ct. App. 2010).  The test for testamentary capacity requires that the testator "understand and appreciate the nature and effect of his act, . . . the natural objects or persons to receive his bounty and their relation to him, and be able to determine what disposition he desires to make of his property." *Id.*

¶92.    The chancellor found as follows on this issue:

> In regards to [Mr. Warren's] mental competency and the capacity to execute a new will[,] the Court finds that he did have that ability based upon the reasoning stated previously, which is bolstered by the testimony of the two [attesting] attorneys who testified that the Deceased was at all times aware of what he was doing and they did not doubt his mental capacity.

¶93.    We find that substantial evidence supports the chancellor's finding that Mr. Warren had the requisite mental and testamentary capacity on August 3, 2017, when he executed his will.  We particularly note that "the testimony of subscribing witnesses is entitled to greater weight than the testimony of witnesses who were not present at the time of the will's

35

execution or did not see the testator on the day of the will's execution." *In re Est. of Edwards*, 520 So. 2d 1370, 1373 (Miss. 1988); *Noblin*, 54 So. 3d at 294 (¶43); *Est. of Phelps v. Phelps*, 180 So. 3d 835, 839 (¶20) (Miss. Ct. App. 2015); *In re Est. of McQueen*, 918 So. 2d 864, 871 (¶30) (Miss. Ct. App. 2005).

¶94.    A discussion of the supreme court's analysis of this issue in *In re Edwards* is instructive.  There, the chancellor found that the testator lacked capacity, basing his finding primarily on the testimonies of the testator's doctors, "who, though not present on September 30, 1982 [(the date the will was executed)], testified that, based on their previous examinations, [the testator's] mental capacity would have been substantially impaired by that date." *Id.* at 1372.

¶95.    The supreme court reversed the chancellor's finding, observing, "whether [the testator] possessed testamentary capacity when attended by his physicians months before the will's execution, is irrelevant to the issue before us; rather, we are concerned with his testamentary capacity on September 30, 1982 [(the date he executed his will)]." *Id.* at 1373. On that point, the supreme court found that "the evidence was overwhelming" that the testator had the requisite capacity, as stated by the attesting witnesses, as well as other witnesses who saw the testator on September 30, 1982, and testified that he looked "fine" and "sane and sober." *Id.*

¶96.    In the case before us, Mr. Warren initialed each page of his will and signed it.  The 2017 Will contained an attestation clause signed by attorneys Crow and Martin, which provided in relevant part that Crow and Martin witnessed Mr. Warren sign his will and, as

36

attesting witnesses, they "certify that on the day and date that said Will was signed, published and declared by the above named Newell Gene Warren, [that] he was then and there . . . of sound and disposing mind, memory and understanding."

¶97. Crow and Martin also executed an affidavit that was a part of the 2017 Will that similarly provided:

> PERSONALLY APPEARED BEFORE ME, the undersigned authority in and for the jurisdiction aforesaid Daniel M. Martin and John J. Crow, Jr. as subscribing witnesses and affiants to the Last Will and Testament of Newell Gene Warren, who having been by me duly sworn, on oath state:
>
> That they are subscribing witnesses to the Last Will and Testament of Newell Gene Warren, and that the said Newell Gene Warren published and declared said instrument as his Last Will and Testament, on the 3rd day of August, 2017, the day of the date of said instrument, in the presence of Daniel M. Martin . . . and John J. Crow, Jr. and each other subscribed their names to the said Last Will and Testament of Newell Gene Warren, at the special instance and request of Newell Gene Warren, in his presence and in the presence of each other.
>
> Affiants further state that at the time of the execution of the Last Will and Testament of Newell Gene Warren, he was of sound disposing mind and memory and that he was more than twenty-one (21) years of age, and that the affiant[s] subscribed and attested said instrument as witnesses to the signature of the publication thereof, at the special instance and request of Newell Gene Warren, in his presence of each other, on the day and year of the date thereof.

*See Phelps*, 180 So. 3d at 839 (¶¶18-20) (determining that the evidence supported a finding of testamentary capacity where attesting witness testified that "she would not have signed the will's attestation clause if she felt, through her interactions with [the testatrix when she executed her will] . . . that [she] was not of sound and disposing mind and memory"); *see also Froemel v. Est. of Froemel*, 248 So. 3d 876, 877, 880 (¶¶3, 13) (Miss. Ct. App. 2018) (recognizing the relevancy of a properly executed attestation clause and affidavits in

37

considering testator's testamentary capacity).

¶98. Both the attestation clause and the affidavit attached to the 2017 Will show that it was executed in front of Crow and Martin, and Crow testified that "[i]f he signed it in front of me, we went over it, so we talked about it." Crow confirmed he did not have any concern that Mr. Warren lacked the testamentary capacity to execute his 2017 Will. Crow testified, "He had it together. You know, he was . . . in control of himself." Martin, the other witness to Mr. Warren's 2017 Will, also testified that he "never questioned [Mr. Warren's] capacity" to execute the 2017 Will or that he intended the directives in that will. Martin confirmed that if either he or Crow had any doubt about Mr. Warren's capacity to execute the will, they would not have allowed him to do it. Further, Dr. Perkins reviewed the depositions of Crow and Martin, as well as Mr. Warren's medical records. Dr. Perkins opined with a reasonable degree of medical certainty that Mr. Warren had testamentary capacity during the July/August 2017 time period when the will was executed.

¶99. We recognize that Dr. Odom questioned Mr. Warren's mental capacity as discussed above, but we also detailed Dr. Perkins's misgivings about Dr. Odom's testimony on this issue. We also recognize that Terry described four occasions over the years when Mr. Warren had appeared confused. But neither Dr. Odom nor Terry were present when Mr. Warren executed his will, and thus their testimonies carry less weight than those of the attesting witnesses, Crow and Martin. Additionally, Sherry acknowledged that an incident Terry had described about their father's confusion had happened, but she said it occurred because her father "was diabetic and had low blood sugar." Further, when Sherry was

38

informed during cross-examination that her father had likely suffered small strokes before his severe stroke in December 2018, Sherry testified that her father had never "acted as if he . . . were a stroke victim" around her. She pointed out that "[i]f he had, Terry and I both would have addressed it and taken care of it."

¶100. We also observe that the 2017 Will reflects a natural disposition of Mr. Warren's property to his daughter, and Crow's testimony shows that Mr. Warren understood and appreciated the effects of his actions. Specifically, Crow testified that Mr. Warren told him that "Terry already had enough assets to—he had a lot of assets. Terry had done real well." Crow testified, "And I guess he wanted to kind of direct what he had to go to somebody who needed it more . . . [and that was] [h]is daughter."

¶101. Additionally, although Items II and III of the 2017 Will did not dispose of property under the will, these items do illustrate that Mr. Warren knew the other "natural objects of his bounty" and did not neglect either Gladys or Terry. Namely, Item II provided that the marital home was held by Mr. Warren and Gladys "as tenants by the entirety with rights of survivorship" and would pass to Terry should Gladys predecease Mr. Warren. Item III referenced a life insurance policy and an IRA naming Gladys, Terry, and Sherry as beneficiaries. These provisions also show that Mr. Warren knew how to dispose of his property both through a last will and testament and outside of his estate.

¶102. In short, we find that substantial, credible evidence supports the chancellor's finding that Mr. Warren had the requisite mental and testamentary capacity at the time he executed his 2017 Will. Accordingly, we find that Gladys and Terry's contentions to the contrary are

unavailing.

## CONCLUSION

¶103.  In sum, for the reasons addressed above, we grant Appellee's December 12, 2023

Motion to Strike Exhibit "A," Records Excerpts of Appellants Volume 3.  Further, for all the

reasons discussed above, we affirm the chancellor's March 27, 2023 Opinion and Order.

¶104.  **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.  WESTBROOKS AND McDONALD, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**